# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

M. KATHLEEN McKINNEY, Regional Director of
Region 15 of the National Labor Relations Board, for and
on behalf of the NATIONAL LABOR RELATIONS
BOARD,

Petitioner-Appellee

v.

STARBUCKS CORPORATION,

Respondent-Appellant

On Appeal from the
United States District Court
for the Western District of Tennessee, Memphis Division
Honorable Sheryl Lipman

District Court Case No. 2:22-cv-02292-SHL-cgc

## BRIEF OF APPELLANT

A. John Harper III
Texas Bar No. 24032392
ajharper@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:  713.951.9400
Facsimile:  713.951.9212

Arthur T. Carter
Texas Bar No. 00792936
atcarter@littler.com
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201-2931
Telephone:  214.880.8100
Facsimile:   214.880.0181

*Attorneys for Respondent-Appellant*

# TABLE OF CONTENTS

PAGE

I. STATEMENT CONCERNING ORAL ARGUMENT ........................................1

II. JURISDICTIONAL STATEMENT..................................................1

III. STATEMENT OF ISSUES PRESENTED FOR REVIEW ..............................1

IV. STATEMENT OF THE CASE ......................................................2

    A.    Partners Begin Organizing and Host an Unauthorized After-Hours Gathering at the Memphis Store.................................2

    B.    Notwithstanding the Separations, the Memphis Store Partners Continue Openly Supporting the Union and the Discharged Partners Continue Organizing. ...........................................4

    C.    The Union Publicizes the Separations and Successfully Furthers its Organizing Efforts Nationwide. ......................................6

V. PROCEDURAL HISTORY................................................................8

    A.    The Underlying Unfair Labor Practice Charges. ......................8

    B.    The Section 10(j) Proceedings and District Court Decision. ...................................................................................9

VI. SUMMARY OF THE ARGUMENTS.................................................12

VII. STANDARD OF REVIEW............................................................16

VIII. ARGUMENTS AND AUTHORITIES............................................16

    A.    The District Court Ignored the Totality of the Evidence and Relied on Speculation in Ordering the Discharged Partners Be Reinstated. ...........................................................17

        1.    *The District Court Failed to Properly Account for the Union's Election Victory.* .......................................18

2. *The Board's and District Court's Shifted Theory of Erosion in Support for Bargaining Is Not Supported by Sufficient Evidence or a Proper Legal Basis to Warrant Extraordinary Relief.* ......................................20

3. *The District Court Abused its Discretion by Issuing an Injunction to Create Optimal Bargaining Conditions.*....................................................28

B. The District Court Abused its Discretion by Erroneously Defining the Status Quo.........................................................30

C. Section 10(j) Injunctive Relief Is an Extraordinary Remedy and Must Be Reserved for Extraordinary Circumstances. ........................................................34

D. The District Court Abused its Discretion by Failing to Consider that the Union Has Unclean Hands in Causing the Alleged Chill. ....................................................38

E. Because the Court Abused Its Discretion in Ordering Reinstatement, Its Entire Injunction Should Be Vacated. .......42

F. The District Court Applied the Incorrect Standard to Determine Whether Section 10(j) Relief Is Warranted. ..........42

IX. CONCLUSION..............................................................45

X. CERTIFICATE OF SERVICE .........................................47

XI. CERTIFICATE OF COMPLIANCE................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ahearn v. Jackson Hosp. Corp.*,
    351 F.3d 226 (6th Cir. 2003) ...............................................................32, 39, 43

*Angle v. Sacks ex rel N.L.R.B.*,
    382 F.2d 655 (10th Cir. 1967) .........................................................................20

*Boire v. Pilot Freight Carriers, Inc.*,
    515 F.2d 1185 (5th Cir. 1975) .........................................................................39

*Calatrello v. Automatic Sprinkler Corp. of Am.*,
    55 F.3d 208 (6th Cir. 1995) ........................................................................32, 39

*Calatrello v. General Die Casters*,
    No. 1:10-CV-2421, 2011 WL 446685 (N.D. Ohio Jan. 11, 2011) ....................33

*Chester v. Grane Healthcare Co.*,
    666 F.3d 87 (3d Cir. 2011) ........................................................................35, 43

*Coleman-Bey v. Bouchard*,
    287 Fed. Appx. 420 (6th Cir. 2008)..................................................................41

*Cyber Solutions International, LLC v. Pro Marketing Sales, Inc.*,
    634 Fed. Appx. 557 (6th Cir. 2016)..................................................................41

*Eisenberg v. Wellington Hall Nursing Home*,
    651 F.2d 902 (3d Cir. 1981) .............................................................................33

*Frankl v. HTH Corp.*,
    650 F.3d 1334 (9th Cir. 2011) .........................................................................33

*Glasser v. Douglas Autotech Corp.*,
    781 F. Supp. 2d 546 (W.D. Mich. 2011).........................................................33

*Glasser v. Precision Gage--Dearborn, LLC*,
    No. 02-73753, 2003 WL 22140116 (E.D. Mich. Jan. 27, 2003)......................32

*Gottfried v. Frankel*,
818 F.2d 485 (6th Cir. 1987) .............................................................39

*Gottfried v. Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 80*,
927 F.2d 926 (6th Cir. 1991) .............................................................32

*Hartman & Tyner*,
714 F.3d at 1249 ...............................................................................35

*Hoffman v. Inn Credible Caterers, Ltd.*,
247 F.3d 360 (2d Cir. 2001) ..............................................................43

*Johnson Controls, Inc.*,
368 NLRB No. 20, slip. op. (2019) ...................................................18

*Kinney v. Pioneer Press*,
881 F.2d 485 (7th Cir. 1989) .............................................................43

*Lund v. Case Farms Processing, Inc.*,
794 F. Supp. 2d 809 (N.D. Ohio 2011) .............................................33

*McKinney v. Ozburn-Hessey Logistics*,
LLC, 875 F.3d 333 (6th Cir. 2017)...............................16, 17, 34, 39

*Miller v. California Pac. Med. Ctr.*,
19 F.3d 449 (9th Cir. 1994) (en banc) ..............................................43

*Minor v. Comm'r of Soc. Sec.*,
826 F.3d 878 (6th Cir. 2016) .............................................................41

*N.L.R.B. v American Nat'l Ins. Co*,
*343 U.S. 395* (1952) ..........................................................................30

*N.L.R.B. v. Burns International Security Services, Inc.*,
406 U.S. 272 (1972)...........................................................................30

*N.L.R.B. v. Falk Corp.*,
308 U.S. 453 (1940)...........................................................................35

*Hooks ex rel. N.L.R.B. v. Nexstar Broad., Inc.*,
No. 21-35252, 2022 WL 17411057 (9th Cir. Dec. 5, 2022) .................27, 28, 36

ii

*Blyer ex rel. N.L.R.B. v. P & W Elec., Inc.*,
    141 F. Supp. 2d 326 (E.D. NY, 2001) ...............................................................20

*Arlook ex rel. N.L.R.B. v. S. Lichtenberg & Co.*,
    952 F.2d 367 (11th Cir. 1992) ...............................................................39, 43

*N.L.R.B. v. Seligman & Assocs., Inc.*,
    808 F.2d 1155 (6th Cir. 1986) ...............................................................36

*Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*,
    570 F.3d 534 (4th Cir. 2009) ...............................................................43, 44

*Pye ex rel. N.L.R.B. v. Sullivan Bros. Printers, Inc.*,
    38 F.3d 58 (1st Cir. 1994) ...............................................................43

*Sharp ex rel. N.L.R.B. v. Webco Indus., Inc.*,
    225 F.3d 1130 (10th Cir. 2000) ...............................................................43

*N.L.R.B.. v. Allied Products Corp.*,
    548 F.2d 644 (6th Cir. 1977) ...............................................................32

*Pascarell ex rel. N.LR.B. v. Vibra Scew, Inc.*,
    904 F.2d 874 (3rd Cir. 1990) ...............................................................33

*Nafziger v. McDermott Intern., Inc.*,
    467 F.3d 514 (6th Cir. 2006) ...............................................................16

*McKinney ex rel NLRB v. Creative Vision Resources, LLC*,
    783 F.3d 293 (5th Cir. 2015) ...............................................................34, 36

*Pye ex rel. NLRB v. Excel Case Ready*,
    238 F.3d 69 (1st Cir. 2001)...............................................................33

*NLRB v. Hartman and Tyner, Inc.*,
    714 F3d 1244 (11th Cir. 2013) ...............................................................34

*Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.*,
    551 Fed. Appx. 825 (6th Cir. 2014)...............................................................*passim*

*Overstreet v. El Paso Disposal, L.P.*,
    625 F.3d 844 (5th Cir. 2010) ...............................................................43

*Ozburn-Hessey Logistics, LLC v. N.L.R.B.*,
   939 F.3d 777 (6th Cir. 2019) ...................................................................*passim*

*Pleasantview Nursing Home, Inc. v. N.L.R.B*,
   351 F.3d 747 (6th Cir. 2003) ....................................................................25

*Salazar v. Buono*,
   559 U.S. 700 (2010) ....................................................................................40

*Schaub v. W. Michigan Plumbing & Heating, Inc.*,
   250 F.3d 962 (6th Cir. 2001) ....................................................................30

*Sharp v. Parents in Cmty. Action, Inc.*,
   172 F.3d 1034 (8th Cir. 1999) ..................................................................43

*Van Dorn Plastic Machinery Co. v. N.L.R.B*,
   881 F.2d 302 (6th Cir. 1989) ...............................................................29, 35

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7 (2008) ...............................................................................2, 16, 44

**Statutes**

Section 8(a)(5), 29 U.S.C. § 158(a) (5) ...........................................13, 21

28 U.S.C. § 1292(a)(1)...........................................................................1

29 U.S.C. § 151 .....................................................................................29

29 U.S.C. § 158(d) ................................................................................13

29 U.S.C. § 160(j) ..............................................................................1, 21

National Labor Relations Act ...........................................................16, 35

NLRA ...............................................................................................17, 35

**Other Authorities**

29 C.F.R. § 103.2 ...........................................................18, 22, 25, 26

Sixth Circuit Rule 28(b)(1)(B)................................................................1

Fed. R. App. P. 4(1)(A).........................................................................1

Federal Rule of Civil Procedure 65(a) ......................................................................43

# I.
## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Sixth Circuit Rule 28(b)(1)(B), Respondent-Appellant Starbucks Corporation ("Starbucks") respectfully requests oral argument in this matter. Oral argument will aid the Court in considering the questions presented.

# II.
## JURISDICTIONAL STATEMENT

On May 9, 2022, Region 15 of the National Labor Relations Board ("Board") filed a petition under 29 U.S.C. § 160(j) ("Section 10(j)") in the United States District Court for the Western District of Tennessee seeking injunctive relief against Starbucks based on alleged unfair labor practices that had occurred at Starbucks' store in Memphis, Tennessee. The Board satisfied the jurisdictional prerequisites of Section 10(j) and venue is proper in the Western District of Tennessee based on the location of the alleged unfair labor practices.

On August 18, 2022, the district court granted the Board's petition for an injunction against Starbucks, which is an order appealable to this Court pursuant to 28 U.S.C. § 1292(a)(1). Starbucks timely filed the instant appeal three days later, on August 21, 2022. Fed. R. App. P. 4(1)(A).

# III.
## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court abused its discretion by ordering the reinstatement of seven discharged employees in the absence of evidence that employees' support

for the bargaining process was eroding or that the Board's ability to remedy such an erosion would be rendered a nullity.

2.      Whether the district court properly defined the relevant pre-violation status quo when considering whether Section 10(j) injunctive relief was just and proper.

3.      Whether the district court abused its discretion by failing to consider charging party's role in causing the alleged chilling effect of the alleged unfair labor practices.

4.      Whether the remainder of the district court's injunction should be vacated in light of the court's abuse of discretion with respect to its reinstatement order.

5.      Whether the Sixth Circuit's application of the two-factor "reasonable cause" and "just and proper" test for Section 10(j) relief is proper under Supreme Court precedent as set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).

## IV.
## STATEMENT OF THE CASE

### A.      Partners Begin Organizing and Host an Unauthorized After-Hours Gathering at the Memphis Store.

On January 17, 2022, partners[1] from the Starbucks store located at 3388 Poplar Avenue in Memphis, Tennessee (the "Memphis Store") posted a "Dear Kevin" letter to Twitter announcing their intent to unionize with Starbucks Workers United ("Union").[2] Ex. 3. Starbucks learned of this letter for the first time the next day, on January 18, 2022. Transcript, RE 75, Page ID ## 1037, 1162.

---

[1] Starbucks refers to its employees as "partners."

[2] Starbucks partners generally announce their intent to form a union by posting to Twitter a letter addressed to Starbucks' Chief Executive Officer. During the relevant time period, the Starbucks CEO was Kevin Johnson or Howard Schultz. These letters are referred to as either "Dear Kevin" or "Dear Howard" letters.

Unbeknownst to Starbucks, the Union had arranged for a news crew to visit the Memphis Store after hours on January 18 to interview partners about their campaign. Transcript, RE 73, Page ID # 1413; Transcript, RE 75, Page ID # 1137. That evening, an off-duty partner ushered customers out of the store, locked the store's doors with off-duty partners inside, and then unlocked the doors to allow in another off-duty partner and the news crew. Transcript, RE 73, Page ID ## 1412-13. At that point, there were eleven people inside the store, consisting of nine partners and two members of the media. Off-duty and scheduled partners participated in interviews, which took place in the public lobby of the store's café and in the area behind the store's service line where members of the public (like unauthorized media) are not permitted when a store is open, and certainly not after a store is closed and locked for the day. Transcript, RE 75, Page ID ## 1286-88.

Starbucks learned of the after-hours, closed-store presence of off-duty partners and the news crew at the Memphis Store the next day. Transcript, RE 75, Page ID ## 1137-38; Ex. 30. An investigation was conducted that included review of security footage and conversations with the partners that had been in the store that night. As a result of the investigation, on February 8, 2022, Starbucks separated seven partners for their unauthorized presence at the store after hours: Lakota McGlawn, Luis "Beto" Sanchez, Cara "Nikki" Taylor, Kylie Throckmorton, Nabretta Hardin, Florentino "Tino" Escobar, and Emma Worrell (collectively,

"Discharged Partners"). Transcript, RE 75, Page ID ## 1279, 1288-90, 1292-93; Exs. 9, 39-44, 54. Of the partners separated, five signed the Dear Kevin letter. Ex. 3. Starbucks did not discipline or separate Reaghan Hall, the other organizer who signed the Dear Kevin letter, as she was not present at the unauthorized after-hours gathering. Transcript, ER 73, Page ID # 1511. None of this is disputed.

**B.  Notwithstanding the Separations, the Memphis Store Partners Continue Openly Supporting the Union and the Discharged Partners Continue Organizing.**

By the afternoon of February 8, 2022, Discharged Partners were picketing outside the store in ways that immediately garnered media attention, including protesting as a group on the store's patio, blocking Starbucks managers' path to their vehicles, blocking the drive-thru lane for customers, and circling the store in vehicles honking their horns repeatedly. Transcript, RE 73, Page ID ## 1513, 1570; Transcript, RE 75, Page ID ## 1152-53. These protests continued for weeks, with both the Discharged Partners and currently employed Memphis Store partners, including Aiden Harris, Ax Heiberg, and Reaghan Hall, publicly participating. Transcript, RE 73, Page ID ## 1513, 1570; Transcript, RE 75, Page ID ## 1154-55.

In the aftermath of the terminations, the Union campaign did not go underground. Instead, it remained visible, if not more so, and continued unabated. Union officials seized on the discharges to advance the campaign; organizing committee member and partner Reaghan Hall, instead of backing off of her support

of Union activities at the Memphis Store, energetically kept the campaign going. Transcript, RE 73, Page ID # 1514. Hall spoke with ten new hires at the store "as soon as [she] could" after they were hired (following the February 8 discharges), and nine of the ten new partners said they were willing to support the Union.[3] *Id.* at Page ID ## 1490-91. Those new hires also started wearing pro-Union pins at work after speaking with Hall, as did other partners employed before February 8. *Id.* at Page ID # 1491.

After the discharges, partners approached Hall asking if they could be part of the committee, though Hall declined their request to join. *Id.* at Page ID ## 1511-12; Petition, RE 1-2, Page ID # 85. Hall also introduced the new partners to various Discharged Partners and observed the new partners taking part in demonstrations with the Discharged Partners in front of the store. Transcript, RE 73, Page ID ## 1512-14.

On June 7, 2022, the Memphis partners voted decisively in favor of Union representation, with eleven voting yes and only three voting no. After the district court hearing concluded, Hall and five of the Discharged Partners identified themselves as members of the Union's Memphis Store bargaining committee and

---

[3] As of February 8, the organizing committee had secured 17 Union authorization cards and had filed an official petition for a representation election weeks earlier, so Ms. Hall acknowledged that it was not necessary at that point to secure additional authorization cards, nor did she try to do so. Transcript, RE 73, Page ID # 1505.

sent Starbucks a demand for collective bargaining and a request for information.[4]
Ex. 56.

### C. The Union Publicizes the Separations and Successfully Furthers its Organizing Efforts Nationwide.

Beginning on February 8, 2022, the Union capitalized on the separations in furtherance of its organizing efforts. It began a publicity campaign to inform partners around the country about what happened. It repeatedly posted about the incident on Twitter through an account it knew to be followed primarily by Starbucks partners. Transcript, RE 73, Page ID # 1555. It created the "Memphis 7" moniker to refer to the Discharged Partners on Twitter and in the news media and frequently asserted (incorrectly) that Starbucks separated the seven partners <u>because of</u> their Union support, not because they hosted a private after-hours gathering in the Memphis Store in violation of Starbucks' Maintaining a Secure Work Environment policy. *Id.*; Transcript, RE 75, Page ID ## 992-995. It created pins for workers around the country to wear to show support for the Discharged Partners. Ex. 6. Finally, it arranged for some of the Discharged Partners to travel around the country speaking

---

[4] As of the hearing, and since then, there have been no unfair labor practice charges filed  (which is the only way a matter could end up in a Section 10(j) proceeding) alleging that Starbucks had or has refused to bargain at the Memphis Store.

at rallies and events in various cities and store sites. Transcript, RE 73, Page ID ## 1417, 1543; Exs. 6, 45.

In contrast, Starbucks issued two nationwide communications about the separations. Exs. 14, 22. First, on February 8, 2022, Starbucks explained the incident to partners in a post and second, on February 24, 2022, it issued another statement to address the ongoing misinformation being spread by the Union as it used the separations to bolster its campaign. *Id.* In both, Starbucks stated it respected the rights of partners to seek Union representation and made clear that the separations were not motivated by Union animus.

Contrary to the Board's allegations that Union activities had been chilled, the pace of unionization efforts around the country continued to accelerate throughout February and March. Transcript, RE 75, Page ID # 989. Senior advisor for the Union's Starbucks organizing campaign, Richard Bensinger, testified at the hearing in June that since February, the Union is filing "more petitions every week," the campaign has continued to grow "steadily," and the number of petitions involved is "unprecedented." *Id.* at Page ID ## 989-91. In the same testimony, Bensinger characterized the Starbucks campaign as celebrated and successful, with many elections happening and the Union winning by high margins (*e.g.*, "we win 20 to nothing or 15 to nothing or 21 to 3"). *Id.* at Page ID # 966. Instead of having an inhibiting effect on organizing, the events at the Memphis store were cited in

numerous Dear Howard letters from partners around the country as the reason for organizing. Ex. 50.

<h1 style="text-align:center">V.<br>PROCEDURAL HISTORY</h1>

**A.    The Underlying Unfair Labor Practice Charges.**

On February 9, the Union filed unfair labor practice charges challenging the separations and it thereafter filed additional charges concerning disciplining partner Taylor on January 14, 2022, closing the café lobby in January 2022, more closely supervising Memphis Store partners, and removing postings from the store's community bulletin board. Petition RE 1-2, Page ID ## 17-22.

Starbucks filed a position statement in March and about a month later on April 22, the Board issued a complaint encompassing the aforementioned allegations. *Id.* at Page ID ## 23-33. On May 9, the Board issued an amended complaint, *Id.* at Page ID ## 34-45, and then the next day on May 10, the Board filed the petition seeking Section 10(j) relief. Petition, RE 1, Page ID ## 1-12. The petition alleged that Starbucks violated the Act by engaging in the actions described above and sought injunctive relief from the district court pursuant to Section 10(j). The requested injunctive relief included, among other things, interim reinstatement of the Discharged Partners while the underlying unfair labor practice charges were litigated

through the regular administrative process.[5]

## B.     The Section 10(j) Proceedings and District Court Decision.

In the petition to the district court, the Board alleged that injunctive relief was necessary because of the potential chilling effect the separations were having on the willingness of Memphis Store partners to support the Union at all, as well as on partners at other stores across the country. The petition did not address as a basis for injunctive relief either the willingness of Memphis Store partners to engage in bargaining or to publicly support the Union. *See e.g.*, Petitioner's Memorandum in Support of Petition., RE 1-3, Page ID # 275 (noting concern for a chilling effect on undecided partners). The Board heavily emphasized the supposed chilling effect the separations were having nationwide. *Id.* at Page ID # 278 ("interim reinstatement is necessary now to erase the chill before it is too late to prevent remedial failure on a nationwide scale."). The district court heard the matter on June 9 and 10, 2022, and

---

[5] Further, the petition sought injunctive relief related to all alleged violations included in the May 9, 2022 amended complaint. *Compare* Petition, RE 1, Page ID ## 1-12 *with* RE 1-2, Page ID ## 34-45. In addition to requesting reinstatement of the Discharged Partners, the Board also sought a broad cease-and-desist order, interim recission of discipline issued to Taylor in January 2022, a reading of the Court's Order in front of partners and a Board representative, posting of the Order in the Memphis Store, distribution of electronic copies of the Order to all Starbucks partners nationwide via the Partner Hub, and nationwide distribution via the Partner Hub of a video of a Starbucks official or Board agent reading the Order in the presence of the other person. *Id.* at Page ID # 7-11.

permitted post-hearing briefing which concluded July 1, 2022. Minute Entry, RE 70; Minute Entry, RE 71.

The Union won the Memphis Store election by a wide margin in the time between when the Board filed the 10(j) petition and the hearing. Thereafter, the Board shifted its justification for an injunction. Instead of relying on the alleged chill of the Union's efforts to organize the store, it pivoted to arguing that reinstatement was necessary to ensure partners are able to successfully negotiate their first contract with Starbucks. Petitioner's Post-Hearing Brief, RE 82, Page ID ## 1706-08.

On August 18—almost seven weeks after the issues were fully briefed—the district court issued its Order granting in part the Board's petition for an injunction. The court applied the two-part test for injunctive relief applied in this Circuit, considering first whether there was reasonable cause to believe a violation of the Act occurred and second whether injunctive relief was just and proper. Order, RE 86, Page ID ## 1784-85. Applying this standard, the court found the Board satisfied its burden of showing there was reasonable cause to believe Starbucks violated the Act as alleged.[6] *Id.* at Page ID # 1801. It found injunctive relief was just and proper based almost exclusively on the testimony of one Memphis Store partner, Ax Heiberg, and

---

[6] Starbucks disputes that the Board satisfied its burden of showing there is reasonable cause to believe it violated the Act but does not center its appeal on this issue.

hearsay evidence presented by Heiberg and others. The district court also accepted the Board's shifted theory of the case, finding that interim reinstatement was just and proper because it will "restore the employees' ability to effectively bargain in the ongoing process," and in this connection noted as though it was an apposite factor that there was no evidence the "bargaining process has yet been successful." *Id.* at Page ID ## 1809-10. The court ordered Starbucks to offer reinstatement to the Discharged Partners within five days. *Id.* at Page ID ## 1812-13.[7]

Starbucks sought an emergency stay of the district court's injunctive order before the district court and with this Court. Sixth Circuit Motion to Stay, Dkt. 6-1; District Court Motion, RE 88, Page ID ## 1816-17. Both were denied, and Starbucks fully complied with the injunctive order. Oder Vacating Administrative Stay, Dkt. 34; District Court Denial, RE 96, Page ID ## 1805-1900; Morton Affidavit, RE 101-1, Page ID ## 1932-22. Starbucks now appeals the district court's order on the merits.

---

[7] The district court also ordered Starbucks to comply with other aspects of the Board's requested relief, namely rescinding Taylor's January 2022 discipline, posting the court's Order in the Memphis Store, and ceasing and desisting from engaging in actions described in Section A of the conclusion of the court's Order. Page ID ## 1810-12. The district court did not order Starbucks to read the Order aloud at the Memphis Store, and it did not order Starbucks to distribute the Order nationwide in any form. Page ID # 1811. Starbucks disputes that any of the ordered relief was "just and proper" in this matter but will focus its arguments primarily on the portion of the Order requiring interim reinstatement of the Discharged Partners.

# VI.
## SUMMARY OF THE ARGUMENTS

1.    The Board's Section 10(j) petition was predicated on the Union's organizing effort being derailed due to the discharges. Such organizing failures are a common source of Section 10(j) relief because the Board's remedies are thought to come too late in the process to allow the organizing effort to recover. But this did not come to pass here. Instead, partners voted decisively in favor of Union representation—eleven voting yes and three voting no—despite the discharges.

As a result, rather than relying on the failure or inadequacy of potential Board remedies with respect to the organizing drive, the district court ordered reinstatement on the speculative and unsupported grounds that there was evidence of "some erosion" of Union support for bargaining and an alleged impairment of the communication between the bargaining committee and the bargaining unit. The flaw in the district court's analysis is that there is no evidence that the bargaining process was impaired by the discharges or other alleged unlawful conduct, all of which allegedly occurred prior to the election and prior to the Union's formation of the partner bargaining committee.

Partners expressed support for the bargaining process by electing the Union, selecting a bargaining committee, and issuing a bargaining demand. Discharged partners are members of the bargaining committee along with current partner Hall, and no evidence was presented that the bargaining committee was having trouble

communicating with partners or otherwise engaging in the bargaining process. Simply put, the district court relied on speculation to order reinstatement in support of the bargaining process.

There also is no evidence or indication that the Board's remedial process for addressing Section 8(a)(5)[8] allegations will somehow fail with respect to bargaining issues, and there could not be any such conclusion anyway. There was no evidence or finding that bargaining has failed, no stated legal warrant that an injunction could be based on the concept of the "ability to effectively bargain," and no unfair labor practice charge or complaint under Section 8(a)(5) of the Act related to bargaining, which is a necessary prerequisite for a court to issue a 10(j) injunction to address same. The district court did not explain how alleged erosion of support for the Union's ultimately successful organizing drive somehow also supported an injunction to avoid a remedial failure regarding a bargaining process that is not even the subject of an unfair labor practice complaint. In the absence of the requisite

---

[8] 29 U.S.C. § 158(a) (5). Section 8(a)(5) addresses the duty to bargain and makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, subject to the provision of section 9(a)." Further, 29 U.S.C. § 158(d), defines the duty to bargain: "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representatives of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does compel either party to agree to a proposal or require the making of a concession:…"

compliant and other evidence of a remedial failure regarding bargaining, the district court abused its discretion, and its order should be vacated.

2. The district court further erred by erroneously identifying the status quo to which it was attempting to return the parties. The status quo prior to February 8 was one in which partners were attempting to organize a union, and that effort was allegedly chilled due to the discharges. Following the partners' election of the Union as their bargaining representative, however, this status quo cannot be recreated. This is so because the parties' legal relationship to one another has changed. Rather than being in a situation of the partners seeking to elect a bargaining representative, they now have done so, and Starbucks and the Union are in a legally regulated bargaining relationship. The district court erred by creating an artificial status quo, *i.e.*, one in which a bargaining relationship existed prior to February 8, and then inserting the Discharged Partners back into it.

3. The district court failed to apply an appropriate burden of proof to this case. Courts have held that 10(j) injunctions should only issue in extraordinary or unusual circumstances where the Board's remedial power will fail. Here, the Court issued an injunction to address bargaining issues based on evidence of "some erosion" in partner support for a union organizing drive, but the "some evidence" standard applies at the "reasonable cause" step, not the "just and proper" step, where proof of impairment of the Board's remedial powers is required. Moreover, the

district court failed to tie its theory of erosion of bargaining support to any reasonable risk that a Board remedy for such a situation would fail. Last, the district court incorrectly defined the "status quo" in determining whether an injunction was just and proper, thereby incorrectly concluding that a return to the status quo remained possible when the legal status of organizing at the Memphis Store changed after the Union was certified as the partners' representative for collective bargaining purposes.

4.     The district court failed to address the Union's outsized role in publicizing the separations as a retaliatory event that led to any of the alleged chill caused by the separations. The Union's unclean hands in this regard is a strong equitable factor militating against the issuance of an injunction.

5.     Because the core of this case involves allegedly unlawful discharges, and because the court abused its discretion in making a reinstatement order, the remainder of the district court's order should likewise be vacated. None of the remaining unfair labor practices carry any risk that the Board's remedial order will fail.

6.     The Sixth Circuit should apply the traditional four-factor test for injunctive relief when considering whether to issue an injunction under Section 10(j) in order to bring this Court's approach in line with other circuits applying the four-

factor test and to adhere to Supreme Court precedent set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008).

## VII.
## STANDARD OF REVIEW

In the Sixth Circuit, courts must make two findings to grant Section 10(j) relief: (1) there is "reasonable cause to believe" that the employer has violated the Act, and (2) that temporary injunctive relief to address such alleged violations would be "just and proper." *McKinney v. Ozburn-Hessey Logistics*, LLC, 875 F.3d 333, 339 (6th Cir. 2017). On appeal, this Court reviews a district court's determination as to whether an injunction was just and proper for abuse of discretion. *Ozburn-Hessey Logistics, LLC,* 875 F.3d at 339. "Such abuse exists if the district court 'relie[d] on erroneous findings of fact, applie[d] the wrong legal standard, misapplie[d] the correct legal standard when reaching a conclusion, or ma[de] a clear error of judgment.'" *Nafziger v. McDermott Intern., Inc.*, 467 F.3d 514, 522 (6th Cir. 2006).

## VIII.
## ARGUMENTS AND AUTHORITIES

This case centers on the district court's injunction ordering the reinstatement of the Discharged Partners. Starbucks disagrees with but does not contest the district court's finding that there was reasonable cause to believe violations of the National Labor Relations Act occurred under the first of the extant two-prong standard as found by the district court given the low burden of proof applicable to this inquiry.

The district court abused its discretion, however, in ordering the Discharged Partners be reinstated pending final resolution of this case by the Board for the following reasons.

## A. The District Court Ignored the Totality of the Evidence and Relied on Speculation in Ordering the Discharged Partners Be Reinstated.

The district court abused its discretion in the first instance by ignoring the totality of the record evidence and instead speculating that partner support for the Union during the bargaining process could erode to the point of not being remediable by the Board, and further than an injunction was necessary to restore the employees' ability to "effectively bargain" in the ongoing process. *Ozburn-Hessey Logistics, LLC*, 875 F.3d at 339 (issuance of a 10(j) injunction is just and proper only when it is "necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA."); *Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.*, 551 Fed. Appx. 825, 837 (6th Cir. 2014) (interim injunctive relief is only warranted when the circumstances are such that "the efficacy of the Board's final order may be nullified or the administrative procedures will be rendered meaningless" absent an injunction) (quoting *Sheeran v. Am. Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982)). Specifically, the district court committed clear errors in judgment and otherwise abused its discretion by (i) failing to properly account for the Union's election victory between the time this proceeding was filed and the matter was heard and decided; and (ii) ignoring the totality of the

evidence and instead relying on speculation about collective bargaining to issue an injunction.

  1.  *The District Court Failed to Properly Account for the Union's Election Victory.*

The Board's original theory of this case was an injunction was necessary to avoid the risk that the discharges would succeed in derailing the Union's organizing drive and permanently frustrate the employees' right to freely choose Union representation. Memorandum in Support of Petition, RE 1-3, Page ID ## 257, 274, 278. The problem for the Board and ultimately for the issuance of the injunction, however, is that the organizing drive did not fail. The Memphis Store's election was held about three months after the discharges and the Union won it by a substantial margin.[9] There can be no more powerful evidence of an absence of the erosion of Union support arising from the discharges than a substantial union victory in a subsequent election. Indeed, the Board has described such elections as the "gold standard" of expression of support for a union. *See e.g., Johnson Controls, Inc.,* 368 NLRB No. 20, slip. op. at 12 (2019) (describing the presumption that elections are

_____

[9] The fact that in this case an election was held, votes tallied, and a certification of that election issued despite the presence of unfair labor practice allegations is a recent development in the law. Effective April 1, 2020, the Board implemented new rules related to union elections stating that elections would no longer be blocked by pending unfair labor practice charges, but rather ballots would be opened and counted or impounded in certain circumstances until the charges are resolved. *See* 29 C.F.R. § 103.2. In this case, there is no dispute that the ballots were opened and counted, and that the Union was certified as the partners' bargaining representative.

the best way to determine union support as a "foundational principle" of labor law).

The district court paid lip service to this turn of events, but it did not fully or properly analyze the impact it had on whether, following the election victory, the Board was still faced with a situation in which its remedial order would be rendered meaningless. Order, RE 86, Page ID # 1804. Instead, the district court relied on pre-election evidence, such as the fact that many of the Discharged Partners were on the organizing committee; testimony from Heiberg, a morning shift partner who could only testify about a narrow slice of the workday and a few partners beside himself, that he and others stopped wearing pins despite evidence that pin wearing continued; and Hall's organizing efforts were "narrowed" despite her testimony that she had recruited nine additional Union supporters following the discharges to support its imposition of an injunction. *Id.* at Page ID ## 1804-08. Importantly, all of this evidence relates to whether there was or was not sufficient erosion of support for the Union to cause remedial failure *prior to the election.* The election changed the situation because the question no longer was whether there was sufficient support for organizing. There was.

And none of the cases relied on by the district court for the proposition that reinstatement is a just and proper exercise of judicial discretion involved a situation like this one where (i) employees were discharged; (ii) a Section 10(j) petition was filed seeking reinstatement in the context of an on-going union campaign; and (iii)

after the petition was filed but before the 10(j) injunction was issued, the Union won the election and was certified as the bargaining representative. Rather, in the cases cited by the district court, to the extent they involved pre-election discharges, there was no evidence an election ever occurred. *See e.g., Angle v. Sacks ex rel N.L.R.B.*, 382 F.2d 655, 658 (10th Cir. 1967); *Blyer ex rel. N.L.R.B. v. P & W Elec., Inc.*, 141 F. Supp. 2d 326, 330 (E.D. NY, 2001).

Simply put, the election victory and certification establish that there could be no remedial failure as far as support for Union organizing was concerned. And for the reasons discussed below, in light of this election victory, the evidence relied on by the district court is too speculative or otherwise insufficient to support an injunction on the theory that the Discharged Partners should be returned to work to support bargaining.

2. *The Board's and District Court's Shifted Theory of Erosion in Support for Bargaining Is Not Supported by Sufficient Evidence or a Proper Legal Basis to Warrant Extraordinary Relief.*

Recognizing that the original basis of the Board's injunction petition was undermined by the Union's election victory (and the overwhelming evidence of robust Union activity at Starbucks stores across the nation), the Board and the district court shifted their focus to the need to remedy (1) the "residual chilling impact" of the discharges on partners' ability to support the Union's bargaining committee, and (2) the lack of daily contact between current partners and the Discharged Partners

that could cause harm to the bargaining process. Despite the shifting basis for the Board's request, the district court determined that reinstatement was a "permissible exercise of judicial discretion" and was "reasonably necessary to preserve the Board's remedial power," even though there was no unfair labor practice complaint issued that bargaining (as opposed to organizing) was somehow being impaired under Section 8(a)(5) of the Act. Order, RE 86, Page ID # 1804. *See* 29 U.S.C. § 158(a)(5) (establishing unfair labor practice for failing to bargain in good faith); 29 U.S.C. § 160(j) (setting forth requirement that 10(j) injunctions may only be sought after the issuance of a complaint).

The district court rested its "residual chilling impact" and lack of contact ground for injunctive relief on what it characterized as evidence of "some erosion" of support for the Union, and from this generalized that a Board remedy regarding the alleged bargaining impairment would apparently be meaningless. The erosion evidence on which the court relied consisted of the following:

- The discharges included the leadership of the organizing effort, reducing the internal organizing committee from six persons to one;

- One barista, Ax Heiberg, testified that after the discharges he stopped wearing his Union pin, that others stopped wearing their pins, and that he limited (though did not cease) his discussions about the organizing effort, he "perceived" management was targeting Union activity because he was

told not to talk to protestors while he was working (despite his continuing to do so);

- There was generalized testimony about on-going fear of supporting the Union during the bargaining process, including Heiberg stating that he would not want to be part of the bargaining committee;[10]

- "[S]ome partners believe that, even with the successful election, an ongoing negotiating process amidst the lingering impacts of the terminations renders participants in the bargaining process still 'highly susceptible' to management misconduct";[11]

- Although the discharged partners are on the bargaining committee and bargaining was already underway, the committee members "are limited in their capacity to communicate with, to influence, and to knowledgeably advocate for their fellow union members";

- Hall's recruitment efforts narrowed even though she was able to convince nine of 10 new employees to support the campaign; and

---

[10] This is not an accurate representation of the record. The district court asserts that there was "testimony about continuing fear of supporting the ongoing bargaining process" and uses Heiberg's testimony about his personal feelings as an example without acknowledging that it is the only example in the record. *Id.* at Page ID # 1806.

[11] Again, the record does not support the district court's assertion that "some" partners believe this. It was one partner—Ax Heiberg.

- Relief was proper because the discharged employees could find other work and reinstatement would be an "empty formality."

Order, RE 86, Page ID ## 1805-08.

Each of the district court's conclusions listed above relate to pre-election organizing and not whether there would be remedial failure with respect to bargaining. Further, the conclusion that there was an on-going problem for bargaining rests almost exclusively on the testimony of Ax Heiberg and Reaghan Hall, again regarding alleged pre-election erosion of Union support, which cannot be gainsaid involves facts far attenuated from bargaining.

With respect to Heiberg, the district court ignored that he worked limited hours at the store and his admission that he did not know what happened on other shifts. Transcript, RE 73, Page ID #1581. Thus, his testimony is of limited utility and, at most, supports a finding that some small but unspecified number of partners who worked before 10:00 a.m. stopped wearing Union pins for some unspecified period of time after February 8. The record also reveals and the district court ignores that Heiberg saw other current partners engaging in protests, which is the opposite of support for the Union being eroded. Transcript, RE 73, Page ID ## 1570-71. In fact, the evidence is that Heiberg spoke to protesting partners in front of the store manager without disciplinary consequence and that Heiberg himself participated in

the protests.[12] *Id.*; Transcript, RE 75, Page ID ## 1154-55.

With respect to Hall, the court described her organizing efforts as "narrowed," despite her testimony that she has not held back on either her support of the union activities at the Memphis Store or more generally since the discharges on February 8, and her acknowledgement that she has been energetic in keeping the campaign going at the Memphis Store. Transcript, RE 73, Page ID # 1514. Hall also testified that she spoke with ten new hires at the store "as soon as [she] could" after they were hired (following the February 8 discharges), and while she opted not to ask them to sign authorization cards, nine of the ten new partners said they were willing to support the Union. *Id.* at Page ID ## 1490-91. Those new hires also started wearing pro-Union pins at work after speaking with Hall, a fact which the district court ignored while citing only her later testimony that "almost every person stopped wearing their pins" after the February 8 discharges. *See* Transcript, RE 73, Page ID ## 1491-92.

As described above, Heiberg and Hall contradicted one another and are additionally contradicted by other partners. Both Sanchez and Taylor testified that the Union continued and even strengthened its organizing efforts at the store

---

[12] The fact that the store manager asked Heiberg to work during working time rather than talk to the protestors is not evidence of erosion of Union support or management retaliation, and it is post hoc evidence that has no bearing on whether the separations themselves caused sufficient erosion in Union support to justify an injunction.

following the discharges, other Union supporters did not perceive that current partners were afraid to show support for the Discharged Partners, and partners remained committed to organizing a union. Transcript, RE 73, Page ID ## 1414-15,[13] 1531, 1540-41, 1552; Petition, RE 1-2, Page ID ## 152-53, 187.

Of course, none of this evidence relates to whether there would be a remedial failure with respect to <u>bargaining</u>. It all relates to whether there would be a remedial failure with respect to <u>organizing</u>, and that is the point. The evidence with respect to partner support for bargaining is that the Union won the election by a wide margin, indicating strong partner support for bargaining despite the discharges. As is its right after being certified as employees' representative, the Union formed a bargaining committee of its own choice consisting of Hall and Discharged Partners Sanchez, Hardin, McGlawn, Taylor, and Throckmorton, all of whom continued their organizing efforts and communicated with current store partners following the discharges. Ex. 56; *Pleasantview Nursing Home, Inc. v. N.L.R.B*, 351 F.3d 747, 752 (6th Cir. 2003). Further, the bargaining committee made a bargaining demand, thus commencing the bargaining process. *Id.*

In fact, the only indication that partner support for <u>bargaining</u> would somehow be eroded by the discharges occurring months earlier, despite the intervening

---

[13] Although, on this point at the hearing Nikki Taylor attempted to deviate from her testimony contained in her affidavit. *See* Transcript, RE 73, Page ID ## 1415-17; Petition, RE 1-2, Page ID # 187.

election victory, was Heiberg's singular statement that he would not want to participate in bargaining. Beyond this statement, the district court simply presumes that on-going chill from the discharges could somehow bleed over into the bargaining process despite the Union's election victory, and it speculates that the bargaining committee would have trouble communicating with the bargaining unit if not employed during negotiations.[14] But there is no evidence that such trouble actually existed or was somehow threatened. Hall is still working at the store, the evidence demonstrates that the Discharged Partners are also present in the store, and there is no evidence that current partners have somehow been cut off from communicating with any members of the bargaining committee. To the contrary, the

---

[14] Starbucks refers to the district court's assertion regarding communication as speculation because the court does not cite to record evidence to support this conclusion. There is record evidence on this point, but the district court ruled it was inadmissible. This evidence came from lay witness Richard Bensinger, who attempted at the hearing to offer testimony regarding what makes an effective bargaining committee. Transcript, RE 75, Page ID ## 975, 978. Bensinger is a senior advisor for the Union who was offered by the Board only as a fact witness, so when Bensinger began offering this opinion testimony, the district court correctly ruled it was inadmissible opinion evidence that the court was "not taking for the truth of the matter asserted." *Id.* at Page ID ## 941, 975, 978, 1322. Significantly, the court's ruling on Bensinger's attempted testimony is an acknowledgement that there would need to be evidence related to bargaining, but Bensinger was not a proper source of same. Notably, the Board made no attempt to proffer any other evidence related to bargaining or impairment of same to remedy this evidentiary deficiency. The district court therefore abused its discretion—instead of properly discounting the testimony it ruled was inadmissible evidence, it accepted the testimony as true and made it central to its analysis.

evidence is that they continued to communicate regularly between February 8 and the hearing in June.

The Memphis Store partners chose to bargain collectively through representatives of their own choosing without the Discharged Partners being reinstated. They formed a bargaining committee and provided Starbucks with a bargaining demand without the Discharged Partners being reinstated.[15] Beyond the testimony of Heiberg stating he did not want to participate in bargaining, and the district court's speculation about "generalized chill" and "inability to communicate," there is no evidence that a Board order would be rendered meaningless unless the Discharged Partners were immediately returned to work to support bargaining.

The only way the district court's decision would be well-founded in the absence of evidence is if the court presumed harm from the alleged unfair labor practices simply because it found reasonable cause to believe they occurred. However, as the Ninth Circuit aptly clarified recently, a court cannot presume there has been irreparable harm to a union simply because there was reason to believe the employer engaged in unfair labor practices.[16] *Hooks ex rel. N.L.R.B. v. Nexstar*

---

[15] The district court acknowledged this evidence but discounted it because the post-hearing record was not supplemented to include updates of ongoing contract negotiations. Order, RE 86, Page ID ## 1809-10 n.10. In other words, the record evidence demonstrated that the partners were already beginning the bargaining process prior to any reinstatement orders, but the district court rejected it because there was no evidence of how bargaining progressed in the months after the hearing.
[16] The Ninth Circuit applies the traditional four-factor test for a preliminary

*Broad., Inc.*, No. 21-35252, 2022 WL 17411057, at *10 (9th Cir. Dec. 5, 2022). Rather, the Board must still prove there are facts supporting the assertions of harm. As explained above, the district court did not have those facts in this case. Under these circumstances, the district court abused its discretion by ordering the reinstatement, and its order should be reversed. *See Muffley v. Voith Indus. Servs., Inc.*, 551 Fed. Appx. 825, 18 (6th Cir. 2014) (affirming a district court decision where there was no evidence supporting the Board's claims that denying injunctive relief would "allow support for the [union] to erode to the point that the Board will be unable to adequately remedy the harm resulting from the alleged unfair labor practices.").

> 3. *The District Court Abused its Discretion by Issuing an Injunction to Create Optimal Bargaining Conditions.*

First, ordering injunctive relief to ensure partners can "effectively bargain," as the district court did here, goes beyond ordering injunctive relief that is necessary to protect the Board's ultimate remedial authority. Injunctive relief is to be confined to only that which is necessary to ensure the Board's final orders will not be nullified. As this Court has said, Section 10(j) relief is only just and proper when "the efficacy

---

injunction to determine whether Section 10(j) relief is warranted. *Hooks ex rel. N.L.R.B. v. Nexstar Broad., Inc.*, No. 21-35252, 2022 WL 17411057, at *9 (9th Cir. Dec. 5, 2022). However, the final element—irreparable harm—closely mirrors the just and proper standard applied in this Circuit because this Circuit considers whether the Board's ultimate remedial remedy will be ineffective, and the Ninth Circuit's holding is therefore instructive.

of the Board's final order may be nullified or the administrative procedures will be rendered meaningless." *Voith Indus. Servs., Inc.*, 551 Fed. Appx. at 837 (quoting *Sheeran v. Am. Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982)). Here, there is no allegation, finding, or legal predicate such as an underlying unfair labor practice charge or Board complaint for the district court to even consider and find that partners cannot effectively bargain.

Second, there is no legal warrant for the district court's decision to issue an injunction to ensure that the Union and partners can effectively bargain. It is of course axiomatic that the goal of the Act and of Board remedies is to effectuate the United States' policy of "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151; *Van Dorn Plastic Machinery Co. v. N.L.R.B*, 881 F.2d 302, 308 (6th Cir. 1989).

This policy is fostered by the requirements of the Act at Sections 8(a)(5) and 8(d) that employers and unions alike engage in good faith collective bargaining, but this is the point at which the Board's authority stops, and by extension that of a court acting under 10(j). There is no language in the statue requiring that bargaining be "effective"—that is a matter between the parties—and it is plain on the face of

Section 8(d) that neither party is required to make a concession or agree to a proposal. And it has long been recognized that the Board is without authority to order otherwise. *See N.L.R.B. v American Nat'l Ins. Co, 343 U.S. 395, 404* (1952) ("…the Board may not, either directly or indirectly, compel concession or otherwise sit in judgment upon the substantive terms of collective bargaining agreements."); *N.L.R.B. v. Burns International Security Services, Inc.*, 406 U.S. 272, 303 (1972) (the Board "may not compel one of the parties in the collective-bargaining process to agree to any particular proposal of the other.").

It perforce follows that if the Board is without authority to compel agreement, or "sit in judgment" of the terms of collective bargaining agreements, it is without authority to sit in judgment of or decide what may make bargaining effective, aside from its duty to order bargaining occur in good faith. In grounding the injunction on the need to ensure that parties can effectively bargain, the district court exceeded the permissible scope of Board remedies under the Act, and of its own jurisdiction, by framing relief that the Board could not. This was an abuse of discretion.

**B.      The District Court Abused its Discretion by Erroneously Defining the Status Quo.**

The district court's abuse of discretion is further demonstrated in its failure to properly identify the status quo to which it was attempting to return the parties. The status quo to be restored is the situation that existed <u>before</u> the alleged violations occurred. *Schaub v. W. Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th

Cir. 2001) (noting the status quo is "the state of affairs existing before the alleged unfair labor practices took place.") (quoting *Frye v. Specialty Envelope, Inc.,* 10 F.3d 1221, 1226 (6th Cir.1993)); *Muffley v. Voith Indus. Servs., Inc.*, 551 Fed. Appx. 825, 834 (6th Cir. 2014).

The district court evaluated the state of the Memphis Store during the correct time period—that is, before the February 8, 2022 separations—but defined the relevant status quo incorrectly by failing to consider the legal status of the parties following the election. Specifically, the court accepted the Board's contention that the relevant pre-violation status quo was "the environment of open union support that existed before Starbucks engaged in its pattern of unlawful conduct." Order, Re 86, Page ID # 1803. The district court went on to explain that because several of the Discharged Partners were open Union supporters, reinstating them was necessary to restore the pre-violation conditions. *Id.* at Page ID # 1809. That is, it was necessary to "*restore* the employees' ability to effectively bargain in the ongoing process." *Id.* (emphasis added).

As an initial matter, there is only slight evidence that an "atmosphere of open union support" disappeared as a result of the discharges. As discussed elsewhere in this brief, the evidence demonstrates that there was an atmosphere of open Union support <u>after</u> the discharges in the form of protests at the store, pin-wearing inside the store, active recruitment of new Union supporters, and an overwhelming Union

election victory.

Regardless, defining the effect of the injunctive order as restoring the *ability to effectively bargain* demonstrates a fundamental flaw in how the district court defined the relevant pre-violation status quo; Memphis Store partners had *no right* to collectively bargain with Starbucks on February 8, 2022, because the Union was not the partners' elected or certified representative at that time. *N.L.R.B.. v. Allied Products Corp.*, 548 F.2d 644, 656 (6th Cir. 1977); *Ozburn-Hessey Logistics, LLC v. N.L.R.B.*, 939 F.3d 777, 789 (6th Cir. 2019). Defining the relevant status quo to be restored as "open union support" without consideration of each parties' legal obligations before the alleged violations is too broad in scope and does not align with this Court's precedent. *See Calatrello v. Automatic Sprinkler Corp. of Am.*, 55 F.3d 208, 215 (6th Cir. 1995) (status quo ante included the right to subcontract, so a return to status would as well); *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 229 (6th Cir. 2003) (pre-violation status quo is a certified union seeking a first contract, reinstatement just and proper to prevent chilling negotiations); *Glasser v. Precision Gage--Dearborn, LLC*, No. 02-73753, 2003 WL 22140116, at *7 (E.D. Mich. Jan. 27, 2003) ("Before the alleged unfair labor practice, the status quo was the recognition by Dearborn of the Union. Therefore, the Court concludes that the status quo in this case is the recognition of the Union as the exclusive bargaining agent."); *Gottfried v. Sheet Metal Workers' Int'l Ass'n, Loc. Union No. 80*, 927 F.2d 926, 929

(6th Cir. 1991) (status quo ante would have been party's inclusion in agreement, so just and proper to include them as a party to new agreement); *Glasser v. Douglas Autotech Corp.*, 781 F. Supp. 2d 546, 557 (W.D. Mich. 2011) (defining the status quo as the last lawful status preceding the alleged unfair labor practices).

The cases cited by the district court in its opinion also support the proposition that the legal status of the parties at the time of the alleged unfair labor practice must be taken into consideration when defining the status quo. Throughout the opinion, the district court cites cases holding that reinstatement of discharged employees is just and proper to ensure a nascent union retains support through the bargaining process. However, in these cases, the union had already been elected as the employees' representative at the time of the alleged unfair labor practice, the alleged unfair labor practices relied on in the 10(j) proceeding at issue included 8(a)(5) allegations related to bargaining, and the status quo at issue in each case therefore already included an undisputed right to collectively bargain, unlike the instant case. *See e.g., Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 74–75 (1st Cir. 2001); *Lund v. Case Farms Processing, Inc.*, 794 F. Supp. 2d 809, 822 (N.D. Ohio 2011); *Calatrello v. General Die Casters*, No. 1:10-CV-2421, 2011 WL 446685 (N.D. Ohio Jan. 11, 2011); *Eisenberg v. Wellington Hall Nursing Home*, 651 F.2d 902, 907 (3d Cir. 1981); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1341 (9th Cir. 2011); *Pascarell ex rel. N.LR.B. v. Vibra Scew, Inc.*, 904 F.2d 874, 877 (3rd Cir. 1990).

Properly considering the legal rights and obligations of each party prior to the alleged violations, the proper pre-violation status quo in this matter was a nascent union campaign with no demonstrated majority support (*i.e.* no vote had yet occurred) and no right to collectively bargain. That was the source of the potential remedial failure allegedly justifying an injunction at the time the petition was filed. It is impossible to recreate this situation because the Union won the election, the parties now have a statutorily imposed bargaining obligation, and that process has begun. The old status quo of the partners attempting to organize a union no longer exits and cannot exist as a matter of law given the parties' new bargaining obligation. *Ozburn-Hessey Logistics, LLC,* 875 F.3d at 341 (a finding that a return to the status quo is possible is a prerequisite to Section 10(j) relief). Because the status quo existing prior to the discharged cannot be recreated, the district court abused its discretion by creating a fictional status quo through the reinstatement of the Discharged Partners.

### C. Section 10(j) Injunctive Relief Is an Extraordinary Remedy and Must Be Reserved for Extraordinary Circumstances.

Courts in the Third, Fifth, and Eleventh Circuits applying the same reasonable cause/just and proper analysis in the Section 10(j) context as this Court have recognized that Section 10(j) is "an extraordinary remedy, to be requested by the Board and granted by a District Court only under very limited circumstances." *NLRB v. Hartman and Tyner, Inc.*, 714 F3d 1244, 1249 (11th Cir. 2013); *see McKinney ex*

*rel NLRB v. Creative Vision Resources, LLC*, 783 F.3d 293, 298 (5th Cir. 2015) (stating that 10(j) relief should issue when the employer's alleged violation of the NLRA and the harms caused thereby are concrete and egregious, or otherwise exceptional and those harms have not yet taken their adverse toll such that the status quo prior to the wrongful acts can be preserved); *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 98 (3d Cir. 2011) (quoting *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998) (noting that Section 10(j) relief is just and proper in the "*unusual* likelihood" the Board's remedies will fail). This especially so for reinstatement because reinstalment is "a particularly drastic remedy" and "reinstatement of unlawfully discharged employees…. [is] a matter generally left to the administrative expertise of the Board." *Hartman & Tyner*, 714 F.3d at 1249. (citing *Boire v. Pilot Freight Carriers, Inc.,* 515 F.2d 1185, 1192 (5th Cir. 1975)).

The reason that 10(j) injunctions are limited to the extraordinary and unusual cases involving an ultimate remedial failure is that Congress gave the Board the primary power to enforce the National Labor Relations Act and provided the Board with ample remedies to address violations of the Act through its normal administrative processes. *Van Dorn Plastic Machinery Co. v. N.L.R.B*, 881 F.2d 302, 308 (6th Cir. 1989). The theory underlying these remedies are that they abate any harm or chill caused by the unfair labor practices, even when they occur at the conclusion of the administrative process. *N.L.R.B. v. Falk Corp.*, 308 U.S. 453, 462–

463 (1940); *N.L.R.B. v. Seligman & Assocs., Inc.*, 808 F.2d 1155, 1168 (6th Cir. 1986). Courts have recognized that the primacy of the Board's role in adjudicating these issues is why the standard of proof at the reasonable cause phase of the analysis is fairly low—it is for the Board, not the courts to adjudicate the merits of such claims. *NLRB v. Voith Indus. Servs., Inc.*, 551 Fed. Appx. 825, 827 (6th Cir. 2014).

But that is also why there must be a higher standard of proof required at the just and proper phase. If all that was required to issue a 10(j) injunction was "an adequate foundation" containing evidence of "some erosion of Union support", then Section 10(j) relief would be available in virtually every case. As the Fifth Circuit has recognized, "any unfair labor practice may cause, and often does cause, serious harms affecting the rights of workers and labor unions." *Creative Vision Resources*, 783 F.3d at 302. Section 10(j) injunctions require something more—they require facts demonstrating that the administrative process is insufficient to afford relief as the case appears before the court. *Id.*; *Nexstar Broad., Inc.*, 2022 WL 17411057, at *10.

This is where the district court in this case crossed the line from reserving 10(j) injunctive relief for extraordinary or unusual cases presenting the reasonable risk of remedial failure to creating a situation in which 10(j) relief could be granted in virtually every case. The test is not whether there was evidence of some erosion of Union support in the Memphis Store. The test is whether the evidence of such

36

erosion is sufficient to conclude there is a likelihood of rendering the Board's order meaningless, a nullity. As stated above, the district court failed to explain how the evidence of erosion it identified connected to the organizing drive leapt over the successful election and attached itself to the bargaining process. It wholly failed to identify an unfair labor practice allegation, much less a complaint, related to bargaining, or how a Board remedy ultimately reinstating the Discharged Partners and issuing its own cease and desist order in due course would be rendered meaningless where the immediate emergency, namely the election, had passed with a Union victory, and the bargaining process was just getting underway with participation from several of the Discharged Partners.

Starbucks recognizes that in *Fleischut v. Nixon Detroit Diesel, Inc.*, the Court included a footnote "questioning" the premise that Section 10(j) is reserved for extraordinary cases. 859 F.2d 26, 30 n.4 (6th Cir. 1988) (citing *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 n.26 (3d Cir. 1984)). Despite the *Nixon Detroit Diesel* court's questioning of this premise, this court has never so held, and it should not tacitly do so now by affirming the district court's opinion in this case. In the circuits which have expressly held Section 10(j) relief must be reserved for extraordinary circumstances, they are merely making clear what is implicit in this Court's jurisprudence, namely that (i) it is for the Board, as the agency with specialized knowledge in this area, to decide unfair labor practice cases and the

remedies for unfair labor practice violations; and (ii) it is only in "unusual" or "extraordinary" cases where the Board's administrative processes will be impaired to the point of being meaningless that 10(j) relief is appropriate.

This Court's and other 10(j) cases involving employee discharges demonstrate that the situations in which 10(j) relief ordering reinstatement is appropriate involve situations where, absent such reinstatement, the Union will either not gain status as a bargaining representative or will lose that status. The Union's threatened loss of status is the remedial failure, but that threat is wholly absent here. Instead, to state it again, after the discharges and while this case was pending, the Union gained status as the bargaining representative and began bargaining. For these reasons, the district court abused its discretion by awarding 10(j) relief in a case where there is little or no threat of a failure of the Board's remedial powers.

**D.  The District Court Abused its Discretion by Failing to Consider that the Union Has Unclean Hands in Causing the Alleged Chill.**

The district court also abused its discretion by failing to consider evidence that it was the Union, not Starbucks, that primarily publicized the separations and created a narrative that they were retaliatory. While the Sixth Circuit does not incorporate the traditional four-factor injunctive relief standard into its just and proper analysis, it still regularly considers equitable factors.[17] *See, e.g., Ozburn-*

---

[17] Starbucks disputes that this is the correct standard to evaluate whether Section 10(j) relief should issue, as explained further *infra* at VIII.F.

*Hessey Logistics, LLC*, 875 F.3d at 341, 343 (noting that the Sixth Circuit previously declined to alter or replace the "reasonable cause/just and proper" standard with "traditional equitable criteria" but still considering whether the Board's delay in filing justified denying injunctive relief); *Gottfried v. Frankel*, 818 F.2d 485, 495-96 (6th Cir. 1987) (a delay in filing does not defeat the just and proper analysis); *Calatrello v. Automatic Sprinkler Corp. of America*, 55 F.3d 208, 214 (district court did not abuse its discretion when denying Section 10(j) relief in part because the injunction would be costly to the employer); *Ahearn v. Jackson Hosp. Corp.,* 351 F.3d 226, 236 n. 2 (6th Cir. 2003) (holding that the reasonable cause/just and proper standard has the "flexibility" to consider "a variety of factual circumstances."); *see also Boire v Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1192-93 (5th Cir. 1975) ("though equity may not control the proper scope of § 10(j) relief, some measures of equitable principles come into play.").

In fact, the Eleventh Circuit—which applies the same two-factor test as this Circuit—has expressly held that a court can deny Section 10(j) "equitable relief on the basis of inappropriate union conduct (such as spreading rumors or sensationalizing wholly unsubstantiated charges against a company)" when such conduct is documented in the record. *Arlook ex rel. N.L.R.B. v. S. Lichtenberg & Co.,* 952 F.2d 367, 374 (11th Cir. 1992). And such a consideration is also in line with the long-established principle that "[a]n injunction is an exercise of a court's

equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (collecting cases).

In this case, the district court did not address why an injunction was just and proper in the circumstances here, where it was the Union, not Starbucks, that was responsible for publicizing the separations, framing the separations as retaliatory, and therefore causing any alleged chill the Board sought to remedy. The Union's Twitter page has over 70,000 followers, nearly half of whom are Starbucks partners. Transcript, RE 75, Page ID ## 991-92. Petitioner's own witness, Bensinger, acknowledged that the Union used its Twitter account to publicize the separation of the Discharged Partners. *Id.* at Page ID ## 993-95. The Union arranged for the partners to travel the country speaking about their experience and perpetuated the claim that the separations were retaliatory in conversation with partners interested in unionizing. *Id.* at Page ID ## 1162-63; Petition, RE 1-2, Page ID ## 152-53; Ex. 21 at 25:22-26:24. In stark contrast, Starbucks publicized these separations twice— once on February 8 in a communication to partners in the Memphis Store and nationwide and once on February 24, 2022 in a nationwide communication. Starbucks did not state or suggest in these posting that the separations had anything to do with the partners' Union support. It is therefore dubious at best for the Board and the Union to claim the organizing drive—nationally or locally—has been chilled

by *Starbucks* where the Union itself is responsible for most of the publicity that allegedly caused the chill.

By failing to consider the aforementioned, the district court discarded relevant evidence, which is an abuse of discretion. *Minor v. Comm'r of Soc. Sec.*, 826 F.3d 878, 883 (6th Cir. 2016) (a district court abuses its discretion when it "fails to explain its reasoning adequately or to consider the competing arguments of the parties."); *Coleman-Bey v. Bouchard*, 287 Fed. Appx. 420, 421 (6th Cir. 2008) (quoting *Burrell v. Henderson*, 434 F.3d 826, 831 (6th Cir. 2006) ("There is abuse of discretion "where the district court fails to consider relevant facts upon which the exercise of its discretionary judgment is based.").

Further, this resulted in the district court penalizing Starbucks for the alleged effects of the Union's own publicization of the discharges as an organizing tool to further galvanize its campaign. *Cf. Cyber Solutions International, LLC v. Pro Marketing Sales, Inc.*, 634 Fed. Appx. 557, 15-16 (6th Cir. 2016) (citing *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) ("The doctrine of unclean hands is an equitable concept that allows a court to deny injunctive or declaratory relief when 'the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party.' "). The district court's injunctive order should be vacated and remanded for the court to properly consider

whether Section 10(j) relief is just and proper when the charging party in the underlying unfair labor practice is primarily responsible for causing the alleged chilling effect.

**E.    Because the Court Abused Its Discretion in Ordering Reinstatement, Its Entire Injunction Should Be Vacated.**

Finally, the district court made clear that this case turns primarily on the discharges. Order, RE 86, Page ID ## 1767, 1810-11. In the absence of the discharges, the remaining unfair labor practices at issue are run-of-the-mill allegations that do not independently threaten the Board's remedial authority. As a result, once the Court vacates the portion of the injunction ordering reinstatement, it should vacate the remainder of the injunction order as well.

**F.    The District Court Applied the Incorrect Standard to Determine Whether Section 10(j) Relief Is Warranted.**

As explained above, the district court applied the two-factor "reasonable cause" and "just and proper" test to determine whether Section 10(j) relief should issue. This was incorrect, and the district court should have instead applied the four-factor test applied to other forms of preliminary injunctive relief.

The circuits are split regarding the test applicable to determining whether to issue a Section 10(j) injunction. The Third, Fifth, Sixth, Tenth, and Eleventh Circuits apply the two-part test for reviewing a Section 10(j) petition, specifically, addressing (1) whether the Board has reasonable cause to believe that unfair labor practices have

occurred, and (2) whether injunctive relief is equitably necessary or in the words of the statute "just and proper." *See, e.g.*, *Chester ex rel. N.L.R.B. v. Grane Healthcare Co.*, 666 F.3d 87, 93 (3d Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850 (5th Cir. 2010); *Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 237 (6th Cir. 2003) ("The prevailing standard district courts in the Sixth Circuit employ when considering a § 10(j) petition is the 'reasonable cause/just and proper' standard."); *Sharp ex rel. N.L.R.B. v. Webco Indus., Inc.*, 225 F.3d 1130, 1133 (10th Cir. 2000); *Arlook ex rel. N.L.R.B. v. S. Lichtenberg & Co.*, 952 F.2d 367, 371 (11th Cir. 1992). The Fourth, Seventh, Eighth, and Ninth, have rejected the two-part approach, and interpret Section 10(j)'s just and proper clause as requiring the traditional four-factor equitable framework that courts apply to grant preliminary injunctions pursuant to Federal Rule of Civil Procedure 65(a). *See, e.g.*, *Muffley ex rel. N.L.R.B. v. Spartan Mining Co.*, 570 F.3d 534, 542 (4th Cir. 2009); *Kinney v. Pioneer Press*, 881 F.2d 485, 490, n.3 (7th Cir. 1989); *Sharp v. Parents in Cmty. Action, Inc.*, 172 F.3d 1034, 1037 (8th Cir. 1999); *Miller v. California Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994) (en banc). The First and Second Circuits apply a hybrid standard: they apply the two-prong, "reasonable cause/just and proper" test, but expressly incorporate the four equitable criteria into the "just and proper" prong. *See, e.g.*, *Pye ex rel. N.L.R.B. v. Sullivan Bros. Printers, Inc.*, 38 F.3d 58, 63 (1st Cir. 1994). *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 368 (2d Cir. 2001).

Starbucks agrees with the analysis of the First, Seventh, Eighth and Ninth Circuits, which either apply or incorporate the traditional, four-factor injunction analysis in the 10(j) context, as set forth by the Supreme Court in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), and contends that this Circuit should adopt this approach as well. Under this standard, Section 10(j) relief should only issue when the Board can "establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest" *Winter*, 555 U.S. at 20. Adopting the same standard used in evaluating other forms of preliminary injunctive relief will bring this Court's precedent in line with Supreme Court's direction that, "unless directed otherwise by Congress, courts should exercise their traditional equitable discretion." *Spartan Mining*, 570 at 542 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).

Application of the correct standard would have led the district court to different results in this case. For example, the district court would not have been able to side-step material factual disputes to find that the Board met a lax "reasonable cause to believe" burden and would have instead concluded that the Board had not established it was likely to succeed on the merits. The district court would have been <u>required</u> to consider equitable factors, such as the Union's unclean hands, before issuing injunctive relief. The district court also would have been unable to disregard

considerations such as the effect a reinstatement order would have on the partners currently employed in the Memphis Store or Starbucks' business. Consideration of such factors and application of a more robust legal standard as to the Board's likelihood of success on the underlying charges would have led to a finding that injunctive relief was not appropriate in this case. However, under either test, the district court abused its discretion by issuing an injunction.

## IX.
## CONCLUSION

For the reasons set forth above, the Court should reverse the District Court's judgment and dissolve its injunctive order.

Respectfully submitted this 12th day of December, 2022,

*/s/ Arthur T. Carter*
Arthur T. Carter
00792936
atcarter@littler.com
LITTLER MENDELSON, P.C.
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, Texas 75201-2931
Telephone: 214.880.8100
Facsimile: 214.880.0181

A. John Harper III
24032392
ajharper@littler.com
LITTLER MENDELSON, P.C.
1301 McKinney Street, Suite 1900
Houston, Texas 77010

Telephone:  713.951.9400
Facsimile:  713.951.9212

*Attorneys for Respondent-Appellant*

## X.
## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document has been electronically filed with the Clerk of the Court by using the CM/ECF system, which will in turn send a notice of the electronic filing to all counsel of record, on this 12th day of December, 2022.


<u>*/s/* Arthur T. Carter</u>


## XI.
## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) because this brief contains 12, 604 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type requirements of Fed. R. App. P. 32(A)(6) because this brief has been prepared in a proportionally spaced typeface using Word with a 14-point font named Times New Roman.


<u>/s/ Arthur T. Carter</u>

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| RE | Description | Page ID |
|----|-------------|---------|
| 1 | Petition | 1-12 |
| 1-2 | Exhibits in Support of Petition | 15-247 |
| 1-3 | Petitioner's Memorandum in Support of Petition | 248-284 |
| 73 | June 9, 2022 Hearing Transcript and Exhibits | 1308-1615 |
| 75 | June 10, 2022 Hearing Transcript and Exhibits | 928-1307 |
| 82 | Petitioner's Post-Hearing Brief | 1699-1717 |
| 86 | Order Granting Petition in Part | 1767-1819 |
| 87 | Notice of Appeal | 1814-1815 |

4854-9364-9213.11 / 055187-1256