# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

Case No. 22-5730

---

M. KATHLEEN McKINNEY, Regional Director of the
Fifteenth Region of the National Labor Relations Board,
for and on behalf of the
NATIONAL LABOR RELATIONS BOARD,

Petitioner-Appellee,

v.

STARBUCKS CORPORATION,

Respondent-Appellant.

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

District Court Case No. 2:22-cv-02292-SHL-cgc

---

## BRIEF FOR PETITIONER-APPELLEE
## NATIONAL LABOR RELATIONS BOARD

---

JENNIFER A. ABRUZZO
General Counsel

PETER SUNG OHR
Deputy General Counsel

RICHARD BOCK
Associate General Counsel

RICHARD J. LUSSIER
Assistant General Counsel

LAURA T. VAZQUEZ
Deputy Assistant General Counsel

LAURIE MONAHAN DUGGAN
Attorney

NATIONAL LABOR RELATIONS BOARD
1015 Half Street Southeast
Washington, District of Columbia 20570
(202) 273-2953

# TABLE OF CONTENTS

I.      COUNTERSTATEMENT IN SUPPORT OF ORAL ARGUMENT .............1

II.     COUNTERSTATEMENT OF JURISDICTION ............................1

III.    COUNTERSTATEMENT OF THE ISSUES ...............................1

IV.     COUNTERSTATEMENT OF THE CASE ....................................2

        A.  Starbucks Employees Try to Form a Union; Starbucks Responds by
            Repeatedly Violating the Act. ...................................3

        B.  Starbucks Closes the Store Early on the Day Local Television News
            Reporters Interview Organizers.................................5

        C.  Starbucks Closes the Lobby Café for Three Days, the Duration of the
            Union's Sit-In Campaign Soliciting Public Support from Lobby Café
            Customers. .......................................................8

        D.  Starbucks Bombards the Memphis Store with Managers. ........9

        E.  Starbucks Removes Pro-Union Materials from Its Community Bulletin
            Board. ...........................................................9

        F.  Starbucks Executes a Mass Discharge of Seven Employees, Including All
            but One Member of the Union Organizing Committee. ...........9

        G.  Starbucks' Barrage of Unlawful Conduct Chills Employee Union
            Activity. ........................................................13

        H.  The District Court Orders Starbucks to Cease and Desist from Unlawful
            Conduct and Reinstate the Discharged Employees to Prevent Irreparable
            Harm. ...........................................................15

           1. The Director seeks § 10(j) relief.............................15

           2. The District Court issues § 10(j) relief. ....................17

           3. The District Court denies Starbucks' motion for a stay. ..........18

i

4. The Sixth Circuit denies Starbucks' motion for a stay..............................19

V.      SUMMARY OF ARGUMENT.....................................................................20

VI.     STANDARD OF APPELLATE REVIEW ..................................................21

VII.    ARGUMENT........................................................................................22

A.  The § 10(j) Standards .........................................................................22

        1.  The "reasonable cause" standard ..............................................23

        2.  The "just and proper" standard .................................................24

B.  The District Court Correctly Found Reasonable Cause to Believe That
    Starbucks Violated § 8(a)(1) and (3)...................................................25

C.  The District Court Did Not Abuse Its Discretion in Concluding That An
    Injunction Is just and Proper to Protect the Board's Remedial Authority and
    Employees' Statutory Rights..................................................................28

        1. Starbucks' violations had a chilling effect on employee willingness to
        support the Union. .........................................................................29

            a.  Evidence of actual chill confirms the predicted effect of Starbucks'
                violations and supports the court's finding of harm............................32

        2.  Absent injunctive relief, the impact of Starbucks' illegal mass discharge
        threatens irreparable harm to the nascent collective bargaining process in
        Memphis, organizing campaigns at other locations, the employees' statutory
        rights under the Act, the Board's remedial authority, and the intent of
        Congress.......................................................................................34

        3.  Starbucks wrongly minimizes the evidence of chill. …………………...39

        4.  The Union's response to the discharges does not render the injunction an
        abuse of discretion. ........................................................................43

        5.  The injunction properly restores the lawful status quo. ...........................45

ii

D.   The District Court Applied the Correct § 10(j) Standard. ...............................48

VIII.  CONCLUSION ...............................................................................................51

## TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575 (2d Cir. 1988) .................... 30

*Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234-235 (6th Cir. 2003) .................................................................................. 23, 24, 25, 30, 38, 47, 48

*Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967) ........................................ 25, 29, 51

*Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367 (11th Cir. 1992) .......................... 38

*Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990) ............. 46

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) ....................... 45

*Boren v. Continental Linen Servs., Inc.*, No. 1:10-CV-562, 2010 U.S. Dist. LEXIS 74348, 2010 WL 2901872 ................................................................... 40

*Catatrello v. Carriage Inn of Cadiz*, No. 2:06-cv-697, 2006 WL 3230778, 2006 U.S. Dist. LEXIS 80918 ................................................................... 40

*Charter Communications v. NLRB*, 939 F.3d 798 (6th Cir. 2019) ....................... 27

*Chester v. Grane Healthcare Co.*, 666 F.3d 87 (3d Cir. 2011) .................................................................................. 23, 24, 25, 49, 50

*D'Amico v. U. S. Serv. Indus. Inc.*, 867 F. Supp. 1075 (D.D.C. 1994) ................. 43

*Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902 (3d Cir. 1981) .................................................................................. 35, 38

*Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26 (6th Cir. 1988) ........ 22, 24, 25

*Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011) .......................................... 30

*Frye v. Specialty Envelope*, Inc., 10 F.3d 1221 (6th Cir. 1993) ........................... 47

*Glasser v. ADT Sec. Sys., Inc.*, 379 F. App'x 483, 485, n.2 (6th Cir. 2010) ......... 23

*Gottfried v. Frankel*, 818 F.2d 485 (6th Cir. 1987) ......................................... 23, 24

*Henderson v. Operating Engineers Local 701*, 420 F.2d 802 (9th Cir. 1969) ...... 43

*Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243 (3d Cir. 1998) .............................. 49

*Hooks v. Ozburn-Hessey Logistics*, 775 F.Supp.2d 1029 (W.D. Tenn. 2011) ...... 30

*Int'l Union of Elec. Workers v. NLRB* (*Tiidee Products, Inc.*), 426 F.2d 1243 (D.C. Cir.) ................................................................................................................ 39

*Kentucky Gen., Inc. v. NLRB*, 177 F.3d 430 (6th Cir. 1999) .......................... 27-28

*Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401 (6th Cir. 1992) ................................................................................................. 21, 23, 24

*Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131 (2d Cir. 2013) ........... 49, 50

*Levine v. C & W Mining Co.*, Inc., 610 F.2d 432, 436-437 (6th Cir. 1979) ................................................................................................. 22, 24, 46, 47

*Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432, 2018 U.S. Dist. LEXIS 209235 at *13 (S.D. Ohio 2018) ............................................................................ 38

*Lineback v. Printpack*, Inc., 979 F. Supp. 831 (S.D. Ind. 1997) ......................... 41

*Link Mfg. Co.*, 281 NLRB 294, 299 n. 8 (1986) .................................................. 31

*McKinney v. Creative Vision Res., L.L.C.*, 783 F.3d 293 (5th Cir. 2015) ............. 50

*McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333 (6th Cir. 2017) ................................................................................... 23, 24, 38-39, 48

*Montgomery Ward & Co. v. NLRB*, 330 F.2d 889 (6th Cir. 1965) ...................... 39

*Muffley v. Voith Indus. Services, Inc.*, 551 F. App'x 825, 827 & n. 1 (6th Cir. 2014) ................................................................................................................ 48

v

*NLRB v. Downslope Indus.*, Inc., 676 F.2d 1114 (6th Cir. 1982) ......................... 27

*NLRB v. Electro-Voice*, 83 F.3d 1559 (7th Cir. 1996) ............................. 30, 34, 38

*NLRB v. Jag Healthcare, Inc.*, 665 F. App'x 443 (6th Cir. 2016) ....................... 27

*NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980) .............................. 30

*NLRB v. Roemer Indus.*, Inc., 824 F. App'x 396 (6th Cir. 2020) .................... 25-26

*Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850-851, 854 (5th Cir. 2010) .................................................................................................... 23, 24

*Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874 (3d Cir. 1990) ........ 31-32, 34, 37, 41

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001) ....................... 31, 32, 40, 45

*Rivera-Vega v. ConAgra, Inc.*, 876 F. Supp. 1350 (D.P.R. 1995) .................. 43-44

*Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962 (6th Cir. 2001) ....................................................................................................... 21, 22, 23, 24

*Sharp v. Webco Indus.*, Inc., 225 F.3d 1130 (10th Cir. 2000) .............................. 51

*Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970 (6th Cir. 1982) ................................................................................................... 25, 29, 49, 50-51

*Silverman v. Whittal & Shon, Inc.*, 1986 WL 15735*1 (S.D.N.Y. 1986) (S.D.N.Y. 1986) ................................................................................................................ 31

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) ....................... 37

*United Servs. for the Handicapped v. NLRB*, 678 F.2d 661 (6th Cir. 1982) ......... 41

*W.F. Bolin Co. v. NLRB*, 70 F.3d 863 (6th Cir. 1995) .................................... 26, 28

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .......................................... 48

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ..... 2, 48, 50

*Yenkin-Majestic Paint Corp. v NLRB*, 124 F.3d 202 (6th Cir. 1997) (table decision), *enforcing* Yenkin-Majestic Paint Corp., 321 NLRB 387 (1996) .......... 26

**Statutes**

28 U.S.C. §§ 1291 .................................................................................. 1

29 U.S.C. § 151 ................................................................................ 1, 29

29 U.S.C. § 157 .................................................................................. 29

29 U.S.C. § 160(j) ............................................................................... 22

**Other Authorities**

S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947) ................................... 51

# I. COUNTERSTATEMENT IN SUPPORT OF ORAL ARGUMENT

Petitioner-Appellee M. Kathleen McKinney, Regional Director ("Director") of Region 15 of the National Labor Relations Board ("Board"), agrees with Respondent-Appellant Starbucks Corporation ("Starbucks") that the Court would benefit from oral argument. The Director would like an opportunity to explain why the decision below should be affirmed and detail how it is supported by the record and settled legal precedent.

# II. COUNTERSTATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under § 10(j) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 151, 160(j) ("§ 10(j)"). The district court issued its final order on August 18, 2022. Starbucks filed a timely notice of appeal on August 21, 2022. This Court has subject-matter and appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1).

# III. COUNTERSTATEMENT OF THE ISSUES

1. Starbucks took unlawful, discriminatory, and coercive actions against employee union activists, including a mass discharge of most of the leading activists, that chilled employees' Union support, undermined the Union during the critical period of bargaining for a first collective-bargaining agreement in Memphis, and negatively impacted organizing campaigns elsewhere. Given this evidence, did the district court act within its discretion in concluding that an order

requiring Starbucks to temporarily reinstate the discharged employees to their former positions, in addition to other relief, is just and proper to prevent irreparable damage to employees' statutory rights pending a final Board order?

2.      This Court's two-part "reasonable cause/just and proper" standard for § 10(j) interim injunctions incorporates equitable principles and accommodates the statutory purposes of § 10(j). This Court reaffirmed the two-part test—after the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)—and rejected a four-part equity test for § 10(j) injunctions. In applying the reaffirmed "reasonable cause/just and proper" test, did the district court apply the correct § 10(j) standard?

## IV.  COUNTERSTATEMENT OF THE CASE

This case teems with striking causal sequences: employees band together to form a union, Starbucks disciplines the employee leader; employees enlist the public to show support in the store, Starbucks temporarily shuts the store down; employees talk to the media about their union effort, Starbucks fires seven pro-union employees en masse; and—in the wake of the mass discharge—employees are scared to support the Union as they did before the violations, the Union has lost its seven of its most outspoken supporters, and one lone organizing committee member remains.

Based on these actions by Starbucks, the Regional Director ("Director") issued an administrative complaint alleging that Starbucks unlawfully interfered with employees' union organizing. Based on that complaint, the Director sought an injunction under § 10(j) of the Act. This case is before the Court on Starbucks' appeal from an order of the U.S. District Court for the Western District of Tennessee, the Honorable Sheryl H. Lipman, District Judge, granting the Director's petition in part for a temporary injunction under § 10(j). (Order, R. 86, Page ID 1767-1813.)

## A. Starbucks Employees Try to Form a Union; Starbucks Responds by Repeatedly Violating the Act.

Union formation at the Memphis store began with one employee, Cara Nicole Taylor. (Transcript, R. 73, PageID 1362, Tr. 55.) Having seen nascent campaigns ripen into representation initially at stores in Buffalo, New York, in December 2021, Taylor contacted the Union and started talking to her coworkers about organizing. (Transcript, R. 73, PageID 1363, Tr. 56.) Taylor spoke with several coworkers at that time, including Kylie Throckmorton, Beto Sanchez, Nabretta Hardin, and Reaghan Hall, and made no attempt to keep her Union discussions secret. (Transcript, R. 73, PageID 1363-64, Tr. 56-57.) In fact, three managers were within earshot during those discussions, District Manager Cedric Morton, store Manager Elizabeth Page, and Assistant Store Manager Mia Poindexter. (Id.) Page reprimanded Taylor as she talked about union organizing,

telling her to stop talking and get back to work. (Transcript, R. 73, PageID 1364-65, 1367-68; Tr. 57-58, 60-61.) By early January, when Taylor had formed an official organizing committee consisting of herself and five other employees, manager Poindexter had interrogated the employees as to what they were discussing among themselves. (Transcript, R. 73, PageID 1363-65, 1367-69; Tr. 56-58, 60-62.)

Once everyone was aware of the budding Union campaign at the Memphis store, Starbucks sent its opening message to pro-Union employees. Choosing founding Union activist Taylor as its target, Starbucks accused her of insubordinate or aggressive behavior and violating the dress code by wearing leggings to work. (January 14, 2022 Corrective Actions Forms, dress code and conduct write-up for Taylor; Pet. Exhs. 1, 2; R. 73, PageID 1370-71, Tr. 63-64.) Yet Starbucks tolerated other instances of insubordination and aggressiveness and had never disciplined an employee for wearing leggings to work. (Transcript, R. 73, PageID 1375-76, 1381, 1434, 1436; Tr. 68-69, 74, 127, 129.)

Nevertheless, the Union campaign became official with a public announcement. Five days after Taylor's discipline, on January 17, Martin Luther King, Jr. Day, the Memphis organizing committee declared the start of their campaign in an open, public letter to Starbucks' then-CEO, which each member signed. (Pet. Exhs. 5, 6; R. 73, PageID 1384-86; Tr. 77-79.) The letter

acknowledged Memphis' significance, given that fifty-four years earlier its sanitation workers struck over the deaths of two employees, and demanded union recognition and better wages, working conditions, and safety measures. (Id.) The letter also recognized the significance of Martin Luther King Jr. in the history of the American labor movement, who had joined the sanitation workers in their protest activities in Memphis. (Id.)

As the Union ramped up efforts to rally support, Starbucks responded to the organizing committee's protected conduct with force.

## B. Starbucks Closes the Store Early on the Day Local Television News Reporters Interview Organizers.

The next day, committee members began wearing Union t-shirts and pins at the store. (Transcript, R. 73, Page ID 1384-86, Tr. 77-79.) Committee member Nabretta Hardin began openly distributing union authorization cards to coworkers. (Petition and Exhibits, R. 1-2, Hardin Affidavit, PageID 96-97.) That day, the Union and committee had arranged to allow a local news crew to interview the organizers at the store that evening. (Transcript, R. 73, Page ID 1382, Tr. 75.) Citing a shortage of staff, Starbucks closed the store early at 6:00 p.m. (Transcript, R. 75, PageID 1080, Tr. 153.) The schedule, however, showed a full crew and everyone who was scheduled to work that night was present for the news interview. (Id.)

Around 6:00 p.m. that evening, as planned, the news crew arrived to interview the organizing committee. (Petition and Exhibits, R. 1-2; Sanchez Affidavit, PageID 145; Hardin Affidavit, PageID 98; Memorandum of Points and Authorities, R. 1-3, PageID 253.) The news crew consisted of one reporter and one cameraman. (Sanchez Affidavit, R. 1-2, PageID 145.) After the crew arrived, Emma Worrell, the only terminated employee not a member of the organizing committee, openly took an authorization card from Lakota Hardin, signed it, and handed it back to her. (Petition and Exhibits, R. 1-2, Worrell Affidavit, PageID 205-06; Memorandum of Points and Authorities, R. 1-3, PageID 253.) The news crew then interviewed the six organizing committee members about why they sought to form a union and their related efforts, filmed a few short clips of the employees in the store, and left by 6:45 p.m. (Petition and Exhibits, R. 1-2; Sanchez Affidavit, PageID 145; Hardin Affidavit, PageID 98; McGlawn Affidavit, PageID 131-32; Memorandum of Points and Authorities, R. 1-3, PageID 253.) To help employee McGlawn with closing duties, employee Sanchez activated the safe. (Sanchez Affidavit, R. 1-2, PageID 146.) The news crew requested a clip of an employee making a drink, so McGlawn went behind the counter to do that. (Petition and Exhibits, R. 1-2; McGlawn Affidavit, PageID 131-32.) The employees moved about the store the same way they would on any other day, including assisting each other with closing duties, making a free drink that could

only be consumed during a break or 30 minutes before or after a shift per Starbucks's policy, and gathering their belongings from the back of the store even if off-duty. (Petition and Exhibits, R. 1-2; Holden Affidavit, PageID 113-14; Hardin Affidavit, PageID 106-08; Sanchez Affidavit, PageID 146-147, 151; Taylor Affidavit, PageID 182; Worrell Affidavit, PageID 211; Starbucks Partner Guide, Exhibit 30, R. 1-2, PageID 232-233.)

That night, the news station posted a picture of the organizing committee on Twitter, stating, "You're looking at the first @Starbucks employees in #Memphis trying to unionize. Hear their grievances, see the steps needed to form a union and find out who's helping these workers tonight on @WMCActionNews5 at 10." (Local News Twitter Post regarding news interview, R. 1-2, PageID 216.) An accompanying online news article quoted each of the employees' expressions of discontent with wages and working conditions and discussed their efforts to unionize as quickly as possible to capitalize on the organizing surge that had already reached at least 22 other stores in 12 states nationwide by that time.[1]

Shortly thereafter, a Starbucks security specialist reviewed the store's 24/7 camera footage of what occurred during the news interview and took screenshots

---

[1] Action News 5 Memphis, *"Starbucks employees in Memphis look to unionize,"* Joyce Peterson, January 18, 2022, available at: https://www.actionnews5.com/2022/01/19/starbucks-employees-memphis-look-unionize/ (last accessed December 11, 2022).

of the employees as they engaged in protected conduct at the store. (Transcript, R. 75, Tr. 354-360, PageID 1281-1287.)

## C. Starbucks Closes the Lobby Café for Three Days, the Duration of the Union's Sit-In Campaign Soliciting Public Support from Lobby Café Customers.

The day after the television news interview, January 19, the organizing committee publicly advertised a sit-in campaign for the following three days, January 21-23, asking for lobby café customers to join them in their struggle. (Transcript, R. 73, Tr. 76, 112, PageID 1383, 1419, 1460; Exh. 5.) The committee posted a flier about the event on Twitter and Instagram that day. (Transcript, R. 73, Tr. 76, PageID 1383, Exh. 5.) Starbucks then closed the lobby café for those three days. (Transcript, R. 73, Tr. 152-163.) District Manager Morton testified that he made the decision to close the lobby before learning about the sit-in, citing "spotty" coverage for those days. (Transcript, R. 75, Tr. 231; PageID 1158.) The store was fully staffed on January 22 and 23, however, but the lobby remained closed. (Transcript, R. 73, Tr. 160-162, Page ID 1467-1469.) When the lobby opened again on January 24 after the sit-in campaign ended, the store was actually understaffed, but manager Page instructed that the lobby remain open. (Transcript, R. 73, Tr. 160-162, Page ID 1467-1469.)

**D.     Starbucks Bombards the Memphis Store with Managers.**

Concurrent with the rise in organizing momentum, District Manager Morton and Store Manager Page both increased their presence at the Memphis store soon after the organizing committee's announcement of the campaign. (Transcript, R. 73; Tr. 85, 173-177; Page ID 1392, 1480-1484.) Not only did its own managers surveil the store, but Starbucks also bombarded the space with managers from other out-of-town stores – managers who had never visited before. (Transcript, R. 73; Tr. 173-176; Page ID 1392, 1480-1483.)

**E.     Starbucks Removes Pro-Union Materials from Its Community Bulletin Board.**

Around the end of January, Store Manager Page removed all the pro-Union notes employees had received from customers in response to their sit-in campaign from the community bulletin board, where an organizing committee member had posted them; but she left other unrelated items hanging on the board. (Transcript, R. 73; Tr. 165-166; Page ID 1392, 1472-1473.) District Manager Morton told Sanchez that it violated company policy to post these notes to the community board. (Id.)

**F.     Starbucks Executes a Mass Discharge of Seven Employees, Including All but One Member of the Union Organizing Committee.**

No containment measure having fully exterminated the Union campaign thus far, on February 8, Starbucks executed a mass discharge of all seven employees—

Florentino Escobar, Nabretta Hardin, Lakota McGlawn, Beto Sanchez, Cara Nicole Taylor, Kylie Throckmorton, and Emma Worrell (collectively "the Memphis Seven")—who engaged in protected conduct on the day of the media interview three weeks earlier and who comprised the majority of the organizing committee spearheading unionization efforts at the Memphis store. (Transcript, R. 75, Tr. 215-225, Page ID 1142-1152; District Court Hearing Exhs. 9, 39-44.) Indeed, Starbucks fired five of the six organizing committee members, and two other employees, one who spoke out in support of the Union at the media interview and the other who openly signed and submitted a union authorization card just before the news interview took place. (Id.)

Starbucks' reasons for terminating the Memphis Seven were one or more of the following on the night of news interview: (1) being in the store while off-duty; (2) entering the back of house or behind the counter while off-duty; (3) unlocking a locked door to allow an unauthorized person to enter while off-duty; (4) activating the safe and handling cash while off-duty; and (5) supervising the previous actions. (Exhibits to Petition, Notices of Separation, R. 1-2, PageID 221-228; District Court Hearing Exhs. 9, 39-44.)

Yet in practice, employees routinely remained in the store or behind the counter while off-duty for several innocuous reasons, such as finishing their free drink, waiting for a coworker, collecting their belongings, or closing up. (Holden

Affidavit, PageID 113-14; Hardin Affidavit, PageID 106-08; Sanchez Affidavit, PageID 146-147, 151; Taylor Affidavit, PageID 182; Worrell Affidavit, PageID 211; Starbucks Partner Guide, Exhibit 30, R. 1-2, PageID 232-233.) Deviation from store rules was common pursuant to an overriding Employer policy to "make the moment right," and former Store Manager Amy Holden had witnessed multiple instances where employees opened locked doors, allowed customers in after hours, and remained in the store or behind the counter after hours. (Transcript, R. 73, PageID 1437-39, Tr. 130-132.) According to Holden, this conduct was "common practice" at all the Starbucks stores at which Holden had worked. (Transcript, R. 73, PageID 1437-39, 1444; Tr. 130-132, 137.) Because only a few employees possess the code to the safe, employees routinely assisted others as a convenience, even if off-duty, because such assistance would relieve the closer from having to obtain the safe code from someone via telephone. (Holden Affidavit, PageID 113-14; Hardin Affidavit, PageID 106-08; Sanchez Affidavit, PageID 146-147, 151.) Employees regularly allowed customers to leave the store after the door was already locked pursuant to an employer policy providing for a ten-minute grace period allowing customers to leave after closing. (Transcript, R. 73, PageID 1437-38, 1451; Tr. 130-31, 144.) Many employees were not aware of policies prohibiting off-duty employees from engaging in the actions discussed, such as going behind the counter, and after the discharges, such routine conduct continued

without discipline from Starbucks. (Transcript, R. 73, Page ID 1485-86, Tr. 178-79.)

The organizing committee expected the reporters at the time they arrived as the Union had arranged the interview. (Transcript, R. 73, PageID 1423-24, Tr. 116-117.) The two reporters came with identifying badges and left forty-five minutes after entering. (Transcript, R. 73, PageID 1424, Tr. 117.) The store was timely closed. (Id.) No employee or customer expressed concern for safety. (Id.) The store's 24/7 surveillance cameras documented only what occurred: a local news station interviewing seven employees about their quest to form a union.

The day after the mass discharge, on February 9, District Manager Cedric Morton posted a letter to the Memphis store employees in the back of the store, and on February 24, Starbucks posted a message on its internal partner hub, accessible to all employees nationwide. (Transcript, R. 73; Page ID 1477-80; Tr. 170-73; Exhs. 13, 14.) The notice to employees discussed "what happened in Memphis" and explained that "several partners are no longer with us." (Transcript, R. 73, PageID 1568, Tr. 261.) Numerous local and national television and print media outlets covered and publicized the mass discharge. (Transcript, R. 73, PageID 1594, Tr. 287.)

**G. Starbucks' Barrage of Unlawful Conduct Chills Employee Union Activity.**

Before the mass discharge, "almost every single person" wore a pin showing support for the Union and some freely discussed the Union with coworkers. (Transcript, R. 73, Page ID 1492, 1564-65; Tr. 185, 257-58.) Post-discharge, according to remaining employee and former open Union supporter Ax Heiberg, "almost every person stopped wearing their pins," no longer comfortable with showing public support for the Union. (Transcript, R. 73, Page ID 1492-93, 1569; Tr. 185-86, 262.) On February 9, the day after the mass discharge, employees were scared and showing regret for supporting the Union. (Transcript, R. 73, Page ID 1492, Tr. 185.) During picketing by some of the Memphis Seven that day, Heiberg declined the picketers' invitation to join. (Transcript, R. 73, Page ID 1570-71, Tr. 263-64.) Store Manager Page watched the interaction and instructed Heiberg not to talk to the picketers and to close and lock the door. (Transcript, R. 73, Page ID 1571, Tr. 264.) By February 24, after Starbucks had posted a "partner update" in the Memphis store informing employees that several employees in Memphis were "no longer with us," Heiberg was one of the employees who stopped wearing their pin and decided to "just keep [his] head down, focus on work. [He] no longer discussed the union with people. [He] was not positive for the union." (Transcript, R. 73, Page ID 1568, Tr. 261.) He did not wear Union paraphernalia because he felt like Starbucks would target him if he did. (Id.) Heiberg stated he did not wish

to be a named member of the bargaining committee because it would invite Starbucks to retaliate against him. (Transcript, R. 73, PageID 1573; Tr. 266.) He confined any mention of the Union to times when he "knew for a fact" that the other employee was pro-Union and that no managers could overhear the conversation. (Transcript, R. 73, Page ID 1569, Tr. 262.) His fear unabated, around April 28, Heiberg reiterated to organizers that he still refused to openly support the Union and was keeping his head down so as not to be targeted for retaliation by Starbucks. (Transcript, R. 73, Page ID 1572-73; Tr. 265-66.) The chill continued to June, where at the district court hearing in this case Heiberg admitted he was scared to testify there because it could cause management to target him if they know him "to participate in union activities" or be "in favor a union," but he did so because, he explained, "it's important to tell the truth." (Transcript, R. 73, Page ID 1573, Tr. 266.)

The Memphis store having lost a third of its staff at once, Starbucks transferred a group of five employees from Store Manager Page's former store, but lone remaining organizer Hall did not feel comfortable approaching them about the Union. (Transcript, R. 73, Page ID 1489, Tr. 182.)

The discharges also had a chilling impact on employees at stores outside of Memphis. For example, when Employee Union Organizer Margaret Carter spoke with employees in Jackson, Tennessee, they told her that they were "very fearful"

about organizing because of what happened to the Memphis Seven based on a notice posted by Starbucks in their store discussing the discharges. (Transcript, R. 73, Page ID 1600, Tr. 293.) Carter spoke to employees at 10-15 Starbucks stores to gauge organizing interest, only to find that at each store, employees mentioned the Memphis Seven as a concern. (Id.) Starbucks Campaign Senior Advisor to the Union Richard Bensinger said that the Memphis discharges created "tremendous anxiety and fear" among employees he spoke to, and that, for example, an employee in Hialeah, Florida was "incredibly nervous for himself that he would be fired like the Memphis people were fired and was having difficulty recruiting a bigger group, a committee, which is critical" to launching a Union campaign, and that the employee's manager warned him not to "have here what happened in Memphis." (Transcript, R. 75, Page ID 960-61, Tr. 33-34.)

During the second week of June, 2022, the Union won the election in Memphis by a vote of 11 to 3. (Transcript, R. 73, Page ID 1343, Tr. 36.)

## H. The District Court Orders Starbucks to Cease and Desist from Unlawful Conduct and Reinstate the Discharged Employees to Prevent Irreparable Harm.

### 1. The Director seeks § 10(j) relief.

On May 10, 2022, the Director, for and on behalf of the Board, filed the § 10(j) petition in district court seeking interim relief pending completion of Board administrative proceedings against Starbucks. (Petition, R. 1.) The petition was

predicated on the unfair labor practices alleged in the administrative complaint, which issued on April 22, 2022, and was amended on May 9, 2022. (Petition and Exhibits, R. 1-2, PageID 23.) The amended complaint alleged that Starbucks violated § 8(a)(1) and (3) by executing a mass discharge of seven employees in retaliation for trying to form a union, removing pro-union materials from the community bulletin board, more closely supervising its employees, closing the lobby café of its facility during and to impede employees from engaging in protected activity, and issuing discipline to lead Union activist Cara Nicole Taylor in retaliation for employees' protected Union activities. (Petition and Exhibits, R. 1-2, PageID 23-44.)

Before the district court, the Director alleged that there was strong cause to believe that Starbucks violated § 8(a)(1) and (3) as alleged in the complaint. (Petition and Exhibits, R. 1-3, PageID 1-282.) The Director further alleged that, absent interim relief, the Board's final order would fail to prevent irreparable harm to the employees' statutory rights to engage in Union activity. (Id.) Thus, the petition sought an order requiring Starbucks, *inter alia*, to cease and desist from engaging in the unlawful conduct as described, rescind Taylor's unlawful discipline, and reinstate the discharged Memphis Seven. (Id.)

## 2. The District Court issues § 10(j) relief.

On August 18, 2022, based on the parties' depositions, testimony, exhibits, supporting affidavits, and briefs, the district court issued its order granting in substantial part the requested temporary injunctive relief. (Order, R. 86, Page ID 1767-1813.)

The district court found that there was reasonable cause to believe that Starbucks violated the Act consistent with the allegations set forth in the administrative complaint. (Order, R. 86, Page ID 1785-1802.) The court further concluded that, based on the demonstrated chilling impact of the violations on employees' support for the Union, interim relief, including reinstatement of the Memphis Seven, was just and proper to restore the status quo, effectuate the policies of the Act, and preserve the Board's remedial powers. (Order, R. 86, Page ID 1802-1811.) In particular, the court found that the mass discharge chilled employee Union activity, including the wearing of Union pins showing open Union support, employee participation in post-discharge protests, and employee willingness to participate in or support the newly-certified Union in collective bargaining. (Order, R. 86, Page ID 1805-1807.)

Accordingly, the court ordered Starbucks to cease and desist from discharging, disciplining, or otherwise discriminating against employees; more closely supervising or monitoring employees; preventing protected activity by

closing lobby service and confiscating and removing Union-related material from its community bulletin board; and interfering with, restraining, or coercing employees in any other manner. (Order, R. 86, Page ID 1812.) The court further ordered Starbucks to reinstate the Memphis Seven, rescind and expunge unlawfully issued discipline, and post the court's order. (Order, R. 86, Page ID 1812-13.) The court declined to grant the request for a nationwide electronic posting, that the notice be read at the Memphis store, and that an electronic copy of a Starbucks official or Board agent reading the district court's order be posted electronically nationwide.

### 3. The District Court denies Starbucks' motion for a stay.

On August 21, 2022, Starbucks filed an Emergency Motion to Stay Pending Appeal or In the Alternative Extend the Deadline for Compliance, seeking a stay of the district court's order pending appeal to this Court. (ECF No. 88.)

On August 26, 2022, the district court denied Starbucks' request for a stay because Starbucks largely asked the court to "do that which it cannot do at this stage", such as resolve evidentiary conflicts, which the court is barred from doing based on established circuit precedent, and because Starbucks failed to successfully argue the court committed clear error or abused its discretion. (District Court Order Denying Stay, R. 22, PageID 1899.) The court highlighted the evidence supporting a chilling impact, noting the relevance of Heiberg's testimony both about his

perception of the workplace environment after the mass discharge and how his actions concretely changed after the mass discharge, i.e., removing his Union pin and refraining from Union discussion and activity. (District Court Order Denying Stay, R. 22, PageID 1891-94.) In addition to this evidence, the court relied on the fact that the decimation of the organizing committee, including the lead Union activist, objectively rendered remaining employees highly susceptible to management misconduct during the collective-bargaining process, especially where remaining employees' contact with members of the bargaining committee was limited due to the discharges. (District Court Order Denying Stay, R. 22, PageID 1892-94.) Finally, the court reiterated that it had explained, with precision, the reasons interim relief was necessary, and reaffirmed that the lawful status quo to be restored is "when the Memphis Seven were employed at the Memphis Store and the chilling effect had yet to occur." (District Court Order Denying Stay, R. 22, PageID 1893-95.)

      4.    **The Sixth Circuit denies Starbucks' motion for a stay.**

On August 23, 2022, Starbucks filed an Emergency Motion to Stay District Court's Preliminary Injunction in this Court. (R. 6-1, Page 1-27.) On the same day, this Court granted Starbucks' request for an administrative stay of the district court's order pending its ruling on the motion to stay. (R. 8-2, Page 1-2.)

On September 6, 2022, this Court vacated the administrative stay and denied Starbucks' motion to stay pending an appeal. (R. 34-2, Page 1-8.)

## V.    SUMMARY OF ARGUMENT

The Director satisfied the two-prong Sixth Circuit § 10(j) standard.

The district court properly found reasonable cause to believe, and Starbucks does not contest on appeal, that Starbucks unlawfully disciplined the Union's lead activist, closed the store to customer presence to restrain protected conduct, removed pro-Union material from the community bulletin board, flooded the store with high-level and out-of-town managers, and executed a mass discharge of seven pro-Union employees.

The district court also correctly concluded that the injunction was "just and proper" to prevent serious public harm. The court's conclusion was supported by record evidence that Starbucks' conduct, particularly the mass discharge of seven pro-Union employees, adversely impacted employees' willingness to engage in Union activity or support the Union following the violations. In particular, the court properly relied on evidence that most employees stopped wearing Union pins after the mass discharge, that open employee discussion of the Union ceased, at least one employee refrained from participating in Union protests and did not wish to serve on the bargaining committee because he feared being targeted for retaliation, and the lone organizing committee member left did not feel

comfortable discussing the Union with five newly-transferred employees. Contrary to Starbucks' contention, courts, including the Sixth Circuit, have acknowledged the irreparable harm to first-contract collective bargaining that flows from the absence of a strong core of employee support. Such harm is particularly acute at the Memphis store, where the mass discharge caused the diminution of over a third of the bargaining unit—all pro-Union employees—and where five of those employees comprised almost the whole of the formerly six-member organizing committee. In addition, the discharges negatively impacted organizing campaigns at locations outside of Memphis. Given this "chilling impact" on employees, absent the injunction requiring that Starbucks reinstate the Memphis Seven on an interim basis and take other remedial action, the employees' collective-bargaining rights under the Act, the public interest, the intent of Congress, and the Board's remedial authority would have been nullified.

## VI. STANDARD OF APPELLATE REVIEW

The district court's determination that injunctive relief is "just and proper" is only overturned if this Court finds an abuse of discretion. *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 970 (6th Cir. 2001). A district court abuses its discretion when it relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard. *Kobell v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1409-10 (6th Cir. 1992).

# VII.  ARGUMENT

## A. The § 10(j) Standards

Section 10(j) of the Act[2] authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual. *See Schaub v. West Michigan Plumbing & Heating, Inc.*, 250 F.3d 962, 970 (6th Cir. 2001); *Levine v. C & W Mining Co., Inc.*, 610 F.2d 432, 436-437 (6th Cir. 1979) (quoting S. Rep. No. 105, 80th Cong., 1st Sess., 27 (1947), reprinted in I *Legislative History of the Labor Management Relations Act of 1947* 433 (Government Printing Office 1985)). *Accord*: *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 28-29 (6th Cir. 1988). Thus, § 10(j) was intended to prevent the potential frustration or

---

[2] Section 10(j) (29 U.S.C. § 160(j)) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See Kobell v. United Paperworkers Int'l. Union*, 965 F.2d 1401, 1406 (6th Cir. 1992).

To resolve a § 10(j) petition, a district court in the Sixth Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether temporary injunctive relief is "just and proper." *See Ahearn v. Jackson Hosp. Corp.*, 351 F.3d 226, 234-235 (6th Cir. 2003); *Schaub*, 250 F.3d at 969; *Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987); *Glasser v. ADT Sec. Sys., Inc.*, 379 F. App'x 483, 485, n.2 (6th Cir. 2010). *Accord*: *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 94-100 (3d Cir. 2011); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850-851, 854 (5th Cir. 2010).

## 1. The "reasonable cause" standard

The Regional Director bears a "relatively insubstantial" burden in establishing "reasonable cause." *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 339 (6th Cir. 2017) (quoting *Ahearn*, 351 F.3d at 237). In determining whether there is reasonable cause to believe that the Act has been violated, a district court may not decide the merits of the case. *Id. See also Schaub*, 250 F.3d at 969; *Gottfried*, 818 F.2d at 493. *Accord*: *Chester*, 666 F.3d at 100. Instead, the Regional Director's burden in proving "reasonable cause" is "relatively

insubstantial." *See Schaub*, 250 F.3d at 969; *Kobell*, 965 F.2d at 1406; *Levine v. C & W Mining Co., Inc.*, 610 F.2d 432, 435 (6th Cir. 1979). Thus, the district court must accept the Regional Director's legal theory as long as it is "substantial and not frivolous." *McKinney*, 875 F.3d at 339; *Ahearn*, 351 F.3d at 237; *Fleischut*, 859 F.2d at 29; *Kobell*, 965 F.2d 1407. *Accord*: *Chester*, 666 F.3d at 101; *Overstreet*, 625 F.3d at 850, 855. Factually, the Regional Director need only "produce some evidence in support of the petition." *Kobell*, 965 F.2d at 1407. The district court should not resolve conflicts in the evidence or issues of credibility of witnesses, but should accept the Regional Director's version of events as long as facts exist which could support the Board's theory of liability. *See Ahearn,* 351 F.3d at 237; *Schaub*, 250 F.3d at 969; *Gottfried*, 818 F.2d at 493, 494.

### 2. The "just and proper" standard

Injunctive relief is "just and proper" under § 10(j) where it is "necessary to return the parties to the status quo pending the Board's processes in order to protect the Board's remedial powers under the NLRA." *Kobell*, 965 F.2d at 1410 (quoting *Gottfried*, 818 F.2d at 495).[3] *Accord*: *Schaub*, 250 F.3d at 970. Thus, "[i]nterim judicial relief is warranted whenever 'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be

---

[3] The status quo to be restored is that which would have happened in the absence of unfair labor practices. *Levine*, 610 F.2d at 437.

nullified or the administrative procedures will be rendered meaningless.'" *Sheeran*

*v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (quoting

*Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)). *Accord: Ahearn*, 351 F.3d at

239; *Fleischut*, 859 F.2d at 30-31; *Chester*, 666 F.3d at 102.

### B. The District Court Correctly Found Reasonable Cause to Believe That Starbucks Violated § 8(a)(1) and (3).

The district court correctly found reasonable cause to believe Starbucks

violated § 8(a)(1) and (3), by disciplining the Union's lead activist, closing the

store to customer presence to restrain protected conduct, removing pro-Union

material from the community bulletin board, flooding the store with surveilling

managers, and executing a mass discharge of seven pro-Union employees.

Starbucks "disagrees" with, but does not contest on appeal, the court's reasonable

cause findings. (Starbucks' Brief, R. 50, PageID 24.)

The district court's unchallenged reasonable cause findings are, in any case,

correct. Regarding Starbucks' discipline of Taylor, the lead Union activist, there is

evidence that Starbucks knew about Taylor's union activity in the days just before

she was disciplined, based on her testimony that three managers were within

earshot during her discussions with coworkers. (Order, R. 86, PageID 1789-91.)

*See, e.g., NLRB v. Roemer Indus., Inc.,* 824 F. App'x 396, 404 (6th Cir. 2020)

(applying small-plant doctrine to bolster inference of knowledge in a facility of

about 20 unit employees because of the closer working environment between

management and labor). The court also properly found anti-union animus, noting the timing of the discipline, Taylor's denial of the alleged misconduct, Starbucks' deviation from past practice in failing to investigate the discipline, and lack of evidence showing the discipline was consistent with that issued to others. (Order, R. 86, PageID 1791-92); *see W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995) (employer deviation from past practice may be a basis to infer discriminatory motive).

The court also properly found reasonable cause to believe that Starbucks unlawfully obstructed the Union's planned sit-in campaign by closing the lobby café and preventing customer presence in the store during the sit-in. (Order, R. 86, PageID 1792-94.) The organizing committee announced the sit-in publicly on social media on January 19, two days before the event was to occur. (Order, R. 86, PageID 1793-94.) The timing of the closure was tailored to prevent customer presence just for the same three-day duration of the sit-in, and the explanation for the closure due to short staffing, despite there being no actual staffing shortage, was pretextual. *See, e.g., Yenkin-Majestic Paint Corp. v NLRB,* 124 F.3d 202 at *1 (6th Cir. 1997) (table decision), *enforcing Yenkin-Majestic Paint Corp.,* 321 NLRB 387 (1996).

Similarly, the court correctly found reasonable cause to believe that the removal of only Union materials from the community bulletin board, while

maintaining other postings, was unlawful. (Order, R. 86, PageID 1795.) *See NLRB v. Jag Healthcare, Inc.,* 665 F. App'x 443, 449-50 (6th Cir. 2016) (test for whether conduct is unlawful is objective; employer's instructions to remove union organizers from premises unlawful).

The increased managerial oversight in the store following the organizing committees' announcement of intent to unionize also deviated from past practice. (Order, R. 86, PageID 1796-98.) *See, e.g., Charter Communications v. NLRB,* 939 F.3d 798, 813 (6th Cir. 2019) (unlawful to monitor employees who had engaged in union activity more closely; the "question is whether the supervision is motivated by earlier union activity").

Finally, the court correctly found reasonable cause to believe that Starbucks' termination of the Memphis Seven was retaliatory. (Order, R. 86, PageID 1798.) The court correctly relied on the proximity of the discharges to the Union activity, including but not limited to the January 18 news interview, Starbucks' demonstrated tolerance of the infractions it suddenly found terminable, and the lack of evidence showing its disciplinary actions were consistent with past discipline it had issued. (Order, R. 86, PageID 1798-1802.) *See NLRB v. Downslope Indus., Inc.,* 676 F.2d 1114, 1118 (6th Cir. 1982) (abruptness and timing of employee's discharge indicate employer's motive to squelch protected activity); *Kentucky Gen., Inc. v. NLRB*, 177 F.3d 430, 436-37 (6th Cir. 1999) (short

time lapse between employees' union activity and layoff, as well as employer awareness of employees' union activity, bolsters finding that layoffs were discriminatorily motivated); *W.F. Bolin Co.*, 70 F.3d at 871 (employer deviation from past practice may be a basis to infer discriminatory motive).

### C. The District Court Did Not Abuse Its Discretion in Concluding That An Injunction Is just and Proper to Protect the Board's Remedial Authority and Employees' Statutory Rights.

The district court properly concluded that an interim order requiring Starbucks to, among other things, reinstate Escobar, Hardin, McGlawn, Sanchez, Taylor, Throckmorton, and Worrell to their prior positions was just and proper. (Order, R. 86, Page ID 1767-1813.) The court's conclusion is well-grounded in the record and Sixth Circuit law. Starbucks' violations had an inherent and actual inhibitive effect on employees' willingness to support the Union. The discharge of most employee union leaders created a support and leadership void that threatened to undermine the employees' ability to effectively bargain a first collective-bargaining agreement with Starbucks. In addition, the discharges had a chilling impact on organizing at other stores. Starbuck fails in its attempts at minimizing the harm threatened by its misconduct and undermining the court's conclusion that an injunction was necessary to prevent that harm. The district court correctly recognized that, without injunctive relief, Starbucks will forever profit from its illegal conduct.

### 1. Starbucks' violations had a chilling effect on employee willingness to support the Union.

As the district court observed (Order, R. 86, Page ID 1809), Congress has declared that "encouraging … collective bargaining" is the "policy of the United States." 29 U.S.C. § 151. In this case, Starbucks' cumulative course of unlawful conduct had a significant chilling effect on employees. It put employees' ability to exercise their § 7 (29 U.S.C. § 157) rights and the collective-bargaining process at risk. The injunctive relief granted by the district court is just and proper to prevent serious public harm because it protects the employees' rights to freely engage in union activity, protects their selection of the Union as their collective-bargaining representative, and preserves the Union's ability to bargain effectively on behalf of the employees by preventing Starbucks' violations from irreparably eroding employee support for the Union over time. In that manner, the injunction prevents the final Board order in this case from being ineffective, consistent with this Court's precedent. *See Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (§ 10(j) injunctive relief is warranted when otherwise "the efficacy of the Board's final order may be nullified or the administrative procedures will be rendered meaningless") (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)).

By their nature, Starbucks' unfair labor practices—especially the mass discharge of five of six key activists, the nucleus of the Union campaign—created

a chilling effect that threatens irreparable harm to employee § 7 rights, even after the employees' majority vote for the Union in a secret-ballot election. The Sixth Circuit and others have recognized the obvious and inherent chilling effect that discriminatory discharges have on employees. *See, Ahearn*, 351 F.3d at 239 (discharges for union activity "have an inherently chilling effect on other employees."), *cited in Hooks v. Ozburn-Hessey Logistics*, 775 F.Supp.2d 1029, 1052 (W.D. Tenn. 2011); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011) (likelihood of success regarding the unlawful discharge of union activists during organizing campaign permits inference of likely irreparable harm to employee interest in unionization); *NLRB v. Electro-Voice,* 83 F.3d 1559, 1572-73 (7th Cir. 1996) ("common sense recognizes the dramatic and long term effects of such activity") (internal quotations omitted); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 213 (2d Cir. 1980) (discharges of union adherents "remain in employees' memories for a long period.").

This principle that discriminatory discharges are inherently chilling is well supported in logic and in case law and the district court correctly acknowledged it. (Order, R. 86, PageID 1774-75.) Employees "are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs." *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988). And without interim relief, employees will have "observed that other workers who had

previously attempted to exercise rights protected by the Act had been discharged and must wait … years to have their rights vindicated." *Silverman v. Whittal & Shon, Inc.*, 1986 WL 15735, *1 (S.D.N.Y. 1986). No worker "in his right mind" will participate. *Id. See also Pye v. Excel Case Ready*, 238 F.3d 69, 74-75, 76 (1st Cir. 2001) ("discharge of active and open union supporters ... risks a serious adverse impact on employee interest in unionization"). A mass discharge only intensifies the chilling impact because it is intended as a harsh and disruptive measure and a clear demonstration to employees of the power an employer wields. *See Link Mfg. Co.*, 281 NLRB 294, 299 n. 8 (1986) (mass layoff "was thus in the nature of a 'power display' in response to the advent of the [u]nion"), *enforced*, 840 F.2d 17 (6th Cir. 1988).

The inherent chilling effect of the mass discharge here was amplified by the fact that it was accompanied by other coercive conduct. Starbucks' immediate and artificial discipline of founding agitator Taylor was just its opening salvo. The calculated closure of the lobby café to restrict the Union's sit-in campaign, removal of notes of Union support from the bulletin board, and the flood of managers surveilling the store post-Union announcement are plainly visible changes that, like the discharges, unambiguously communicated to employees that support for the Union would result in harm. *See, e.g., Pascarell v. Vibra Screw, Inc.*, 904 F.2d

874, 881 (3d Cir. 1990) ("The message that this management action sent was clear - if one is associated with the union, one will be disciplined").

### a. Evidence of actual chill confirms the predicted effect of Starbucks' violations and supports the court's finding of harm.

The inherent, predictable adverse impact of the mass discharge is confirmed by record evidence that employees were, in fact, chilled, as the district court correctly found. (Order, R. 86, PageID 1805.)

The court's finding is amply buttressed in the record by several hallmark indicia of chill. Covering the largest sample of remaining employees, the court correctly relied on evidence that almost every single open union-supporting employee employed before the mass discharge—all but one—stopped wearing their Union pin post-violations. (Order, R. 86, PageID 1806; Transcript, R. 73, PageID 1569, 1588). In addition, as is expected of such an act, the mass discharge stoked employee fear, prompting many employees to express regret about their decision to support the Union. (R. 73, Page ID 1492, Tr. 185); *see Pye*, 239 F.3d at 75 ("the fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)").

The court properly relied on the detailed testimony of Ax Heiberg, who admitted he was scared to testify at the hearing, stopped openly supporting the Union after the violations, kept his head down and confined any Union discussion

to those he could trust and in the absence of managers, and retreated from any open Union support for fear of getting targeted by Starbucks. (Transcript, R. 73, Page ID 1572-73; Tr. 265-66.) Heiberg testified he did not wish to serve as a named member of the bargaining committee for fear of retaliation. (Transcript, R. 73, PageID 1573; Tr. 266). And Starbucks' actions continued to reinforce the message that pro-Union support would be met with retaliation. Store Manager Page explicitly chided Heiberg for interacting with protesters following the discharges, when in fact he was just declining their invitation to join, and Page directed Heiberg to shut and lock the door on the protesters.[4] (Transcript, R. 73, Page ID 1570-71, Tr. 263-64.) Thus, Starbucks' chilling anti-Union message persisted.

While lone organizer Hall approached entirely new employees who did not personally know the Memphis Seven to discuss the Union, she did not approach the five employees transferred from Store Manager Page's former store because she was afraid of the consequences of doing so. (Transcript, R. 73, Page ID 1489, Tr. 182.)

The chill reverberated beyond Memphis, and the district court properly noted this fact. The district court found that the discharges had a chilling impact on

---

[4] Starbucks suggests (Brief, R. 50, PageID 32 at fn. 12) that because Heiberg was on-duty at the time he refused to join the protest his refusal was not evidence of erosion of Union support. To the contrary, Heiberg had a protected right to join the protest in strike and withhold his labor.

organizing at stores in Jackson, Tennessee, where employees were "very fearful about actions that were similar [to the Memphis terminations] taking place in their store if they were to organize" and Southern Florida, where an employee was "incredibly nervous for himself that he would be fired like the Memphis people were;" that he had trouble recruiting employees to the organizing committee, and that his manager told him "Let's just not have here what happened in Memphis." (Order, R. 86, PageID 1808); (Jackson, Tennessee – Transcript, R. 73, Page ID 1600, Tr. 293); (Hialeah, Florida – Transcript, R. 75, Page ID 960-61, Tr. 33-34.)

2.  **Absent injunctive relief, the impact of Starbucks' illegal mass discharge threatens irreparable harm to the nascent collective bargaining process in Memphis, organizing campaigns at other locations, the employees' statutory rights under the Act, the Board's remedial authority, and the intent of Congress.**

Aside from the predictable inhibitive effect on employees, the discharge of the main Union activists creates a leadership void that undermines employees' collective-bargaining efforts into the future. *Electro-Voice*, 83 F.3d at 1573 (organizers' "absence deprives the employees of the leadership they once enjoyed"); *Pascarell*, 904 F.2d at 880 (reinstatement of discharged bargaining committee members warranted because they were "only cohesive group" in bargaining unit). The terminations of six of the seven members of the Union's organizing and bargaining committee resulted in the removal of leaders and core supporters from the workplace, undermining employees' ability to effectively

34

bargain, through their Union, their first collective-bargaining agreement. *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 907 (3d Cir. 1981) (exclusion of union supporters from bargaining process during pendency of administrative proceedings would likely undermine union's position).

Contrary to Starbucks' claim, the fact that a majority of employees were willing to anonymously vote for the Union in the secret ballot election and the employees are now attempting to bargain does not undercut the district court's conclusion that interim relief is warranted. (Starbucks' Brief, R. 50, PageID 26-28.) The court did not, as Starbucks contends, fail to "fully or properly analyze" the import of the Union election victory. (Starbucks' Brief, R. 50, PageID 27.)

The district court's conclusion that, despite the Union election victory, the violations had "enduring chilling effects" on employees and threaten "lingering impacts" on the post-election bargaining process is well supported. (Order, R. 86, PageID 1806, 1807.) The court correctly relied on Heiberg's testimony that, despite casting a secret ballot for the Union, he is afraid to openly support the Union now by, for example, participating in the bargaining committee. (Order, R. 86, PageID 1806-07.) The court also relied on evidence that Hall, the remaining member of the bargaining committee, was reluctant to approach new employees transferred by management from other locations out of distrust, which has limited her efforts to build and maintain support for the Union among current employees.

(Order, R. 86, PageID 1807.) In addition, the court recognized that with most of the bargaining committee members out of the workplace due to their discharges, the committee's bargaining efficacy is hampered. (Order, R. 86, PageID 1806-07.)

The district court is correct that the Union election victory does not negate the evidence of chill in the record or obviate the need for injunctive relief. The Union's election victory reflects employees' anonymous support for the Union at the time the election occurred but does not establish their willingness to *openly* support the Union moving forward with the collective-bargaining process, free from unlawfully created fear. (Testimony of Heiberg that he was not inhibited in casting his ballot because it was anonymous – R. 73, PageID 1583, Tr. 276.) The employees' § 7 rights extend to activities that inevitably occur after the Union has won – the right engage in protected activity in support of the Union without fear of retaliation, to effectively bargain collectively with a legitimate level of Union support, and to advocate for the Union's bargaining positions, through economic weapons if necessary. These are the rights that were still at risk in Memphis in the absence of an injunction because ongoing Union solidarity is necessary for the bargaining committee to effectively negotiate a first contract that will govern these employees' working conditions and serve as the template from which the Union will bargain for years to come. Indeed, the collective employee support of the entire unit is the sole reservoir upon which the Union and bargaining committee

can rely if they need to exercise their statutory rights in support of bargaining goals. *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1193 (9th Cir. 2011) (employee support is necessary for a union "to bargain effectively"). Under the protection of an injunction, the reinstated employees, who comprise the overwhelming majority of the Union's bargaining committee, can also properly bargain for the first contract from the inside. The reinstatement of such a large cadre of pro-Union employees here thus restores the Union to its legitimate level of support, solidifying a necessary employee base from which to advocate. *See Pascarell v. Vibra Screw, Inc.*, 904 F.2d at 880 (discussing patent chilling impact from discharge of entire bargaining committee on the "operative" unit, which is the entire unit of employees, whose support was necessary to withstand likely management intimidation tactics throughout a new, unestablished bargaining process). In addition, interim reinstatement of the Memphis Seven is necessary to remove the chilling impact on organizing campaigns at stores outside of Memphis. Indeed, the court recognized that broader chilling impact. (Order, R. 86, PageID 1808.)

Accordingly, Starbucks is plainly wrong that the Union's election victory means that the court lacked "proper legal basis" for the injunction and that it abused its discretion by granting injunctive relief to protect the bargaining process and create "optimal bargaining conditions." (Starbucks' Brief, R. 50, PageID 28,

36.) On the contrary, courts, including this Circuit, have recognized that reinstating terminated employees to protect the good-faith bargaining process is appropriate under the Act and have granted § 10(j) injunctions precisely for that purpose. *See Ahearn v. Jackson Hospital Corp.*, 351 F.3d 226, 239 (6th Cir. 2003) (interim reinstatement of illegally discharged employees was just and proper to allow union to effectively bargain for a first contact, as the bargaining unit in that context is "highly susceptible to management misconduct"); *Electro-Voice*, 83 F.3d at 1573 (interim reinstatement warranted, in part, to preserve the union's ability to bargain for a first contract); *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 373 (11th Cir. 1992) (injunction warranted to remedy discharge of nine employees, including "employees who were lodestars of the initial organizational efforts," where union was recently certified and employees were bargaining for their first contract and, therefore, "highly susceptible to management misconduct"); *Eisenberg*, 651 F.2d at 907; *Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432 at *5, 2018 U.S. Dist. LEXIS 209235 at *13 (S.D. Ohio 2018) ("in its infancy and bargaining for a first contract, the Union is particularly susceptible to harm if [the discharged activist] is not reinstated"). *See also McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 341 (6th Cir. 2017) (rescinding discriminatory reassignment of union supporter was just and proper given that union was about to bargain for a first contract: "In many ways, this *the* critical moment for the Union." Allowing

the discriminatory reassignment to take place "might undermine the Union's strength on the eve of its first collective-bargaining opportunity.") (emphasis in original).

The district court correctly relied on such precedent. (Order, R. 86, PageID 1804-05). The injunction's continued vitality is therefore crucial to the Union's ability to maintain and rebuild support and engage in collective bargaining. Otherwise, by the time the Board issues a final order, Starbucks will have successfully utilized its illegal actions to defeat the Union and thwart its employees' rights under the Act, contrary to the intent of Congress.[5]

### 3. Starbucks wrongly minimizes the evidence of chill.

Starbucks' attempt to minimize the evidence of actual chilling impact fails. Contrary to Starbucks' contention that there is insufficient evidence of a chilling impact here (Brief, R. 50, PageID 29-32), the district court correctly apprehended the quantum of evidence, i.e., some evidence, required to show that interim relief is

---

[5] An appellate reversal would, moreover, unjustly inure to the benefit of Starbucks if protected activity is again chilled by the mass discharge of the reinstated employees a second time. *See generally Int'l Union of Elec. Workers v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243, 1249 (D.C. Cir.) (remanding because, contrary to sound national labor policy, employer should not be able to "reap a second benefit from his original refusal to comply with the law" or "profit[] through the delay that review entails"), *cert. denied*, 400 U.S. 950 (1970), *citing, Montgomery Ward & Co. v. NLRB*, 330 F.2d 889, 894 (6th Cir. 1965) (redress for a statutory wrong should "withhold from the wrongdoer the 'fruits of its violation'").

just and proper. (Order, R. 86, PageID 1808-09.) *See Catatrello v. Carriage Inn of Cadiz*, No. 2:06-cv-697, 2006 WL 3230778, 2006 U.S. Dist. LEXIS 80918, at *7, *23 (S.D. Ohio 2006) (one employee's testimony about lack of union support was "some evidence that erosion of [u]nion support may have occurred and/or is occurring" and was sufficient to order injunctive relief). The Director need not demonstrate that every, or even a majority, of employees were chilled for injunctive relief to be just and proper to preserve the efficacy of a final Board order, as the district court correctly noted. (Order, R. 86, PageID 1809; District Court Order Denying Stay, R. 22, PageID 1895). Even when some employees feel "'totally uninhibited' in the exercise of their § 7 rights" there is sufficient chilling effect to warrant injunctive relief if "[a]t least some employees" are "afraid to act" in support of the union. *Pye*, 238 F.3d at 74-76. *See also*, *Boren v. Continental Linen Servs., Inc.*, No. 1:10-CV-562, 2010 U.S. Dist. LEXIS 74348 at *14-15, 2010 WL 2901872, at *5 (W.D. Mich. 2010) (conclusive proof of irreparable erosion of employee support not required under just-and-proper standard for the issuance of an injunction). Starbucks' contention that "[t]he test is not whether there was evidence of some erosion of support at the Memphis store" (Brief, R. 50, PageID 44) is plainly contrary to the precedent cited above.

The evidence of post-violation protests by some employees (Starbucks' Brief, R. 50, PageID 12, 31, 39) does not establish that the court abused its

discretion in concluding interim relief was warranted. The fact that some stalwart Union supporters continued to show "some degree of solidarity in adversity" does not negate the harmful impact of Starbucks' misconduct over time, especially on other employees. *See Pascarell*, 904 F.2d at 880. Indeed, despite the protests, there is scant evidence that current employees enjoy any substantial degree of open Union solidarity since the election. It is the chilling impact on non-activist employees, not those stalwart core supporters, that is most critical to determining whether injunctive relief is just and proper. *See id.* at 880-81 (chilling effect of violations significant, even if some employees continued to show "some degree of solidarity;" the "critical" issue is the impact on "non-activist employees, who are the most susceptible to being intimidated"); *United Servs. for the Handicapped v. NLRB*, 678 F.2d 661, 665 (6th Cir. 1982) (discharge of union supporters has an inhibitive "continuing effect" on the remaining employees). "[T]he current solidarity" of the protesters "is not sufficient to overcome the chilling effect of [Starbucks'] actions." *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 847-49 (S.D. Ind. 1997) (interim reinstatement of union president during contract bargaining warranted, rejecting employer argument that there was no chill because employees were actively striking). Moreover, the district court found the discharges' chilling impact on organizing at stores in Jackson, Tennessee, and Southern Florida "complicat[ed] Starbucks' narrative" that the discharges emboldened Union

activity. (Order, R. 86, PageID 1808). Thus, given the evidence of chilling impact on employees from the variety of actions spanning Starbucks' anti-Union campaign, the court's conclusion that there is sufficient evidence of chill despite some ongoing Union activity is firmly rooted in the record and case law.

Starbucks further attempts to minimize the impact of its violations when it claims that interim relief is not warranted here because such relief is reserved for "extraordinary" circumstances. (Starbucks' Brief, R. 50, PageID 42-44). But the mass discharge of seven employees during a nationwide organizing campaign is indeed an "extraordinary" case. Discharging in one fell swoop all but one of the leading Union activists while committing additional, coercive violations is an outstandingly brazen unlawful response to protected concerted activity that would likely have caused irreparable harm to the public interest, the statutory rights of employees, and the Board's remedial authority in the absence of the injunction. This case, like others in which the Board authorizes a Regional Director to seek interim § 10(j) relief in federal district court, is, in fact, "unusual," as evidenced by the Board's sparing use of § 10(j) petitions. Historically, the Board seeks § 10(j) relief on average in approximately two percent of all cases in which unfair-labor-practice complaints are issued.[6] In short, this case is no ordinary labor dispute, as

---

[6] For example, in fiscal year 2022, the Board filed § 10(j) petitions in 19 cases out of 738 unfair-labor-practice complaints issued. *See* NLRB Fiscal Year 2022

Starbucks appears to suggest, but rather an extraordinary one, based on the egregious nature of Starbucks' unfair labor practices and the harm they caused and would continue to cause, absent the court's injunction, to the Board's ability to render a final order that will effectively protect employee rights.

### 4. The Union's response to the discharges does not render the injunction an abuse of discretion.

Starbucks' argument that the district court abused its discretion in granting the injunction because the Union has "unclean hands" in that it publicized the discharges and, thus, contributed to the chilling impact wholly lacks merit. (Starbucks' Brief, R. 50, PageID 46-50.) As a threshold matter, courts have rejected the "unclean hands" defense in §10(j) cases because the Board seeks to protect the public interest and the rights of employees, not that of the Union, when petitioning for relief. *See D'Amico v. U. S. Serv. Indus. Inc.*, 867 F. Supp. 1075, 1080, 1087 (D.D.C. 1994) (rejecting unclean hands defense where union had engaged in three incidents of violence). *See also Henderson v. Operating Engineers Local 701*, 420 F.2d 802, 808 (9th Cir. 1969) (rejecting unclean hands defense in Section 10(l) case); *Rivera-Vega v. ConAgra, Inc.*, 876 F. Supp. 1350, 1372 (D.P.R. 1995) ("both the Board and the Courts have concluded that the

---

Performance Accountability Report, pp. 15 & 86, available at:
https://www.nlrb.gov/reports/agency-performance/performance-and-accountability.

'unclean hands' doctrine is not applicable to Board proceedings"), *affirmed*, 70 F.3d 153 (1st Cir. 1995).

However, even assuming such a defense were applicable, the district court highlighted the impact of the violations on the employees locally, at the Memphis store, and those employees did not need to hear about them from the Union. (Order, R. 86, PageID 1808-09). These local employees all knew about the discharges by word of mouth or local news. (Word of mouth – Transcript, R. 73, PageID 1566, Tr. 259), (Local news – Transcript, R. 73, PageID 1594, Tr. 287). Moreover, national media outlets covered and publicized the mass discharge. (Transcript, R. 73, PageID 1594, Tr. 287.) Thus, that the Union may have later posted about the discharges is irrelevant to whether employees knew about and were impacted by the violations.

More importantly, the discharges had already been publicly, officially, indiscreetly, and widely disseminated by Starbucks itself. District Manager Morton hung a notice about the discharges at the back of the Memphis store. (Transcript, R. 73; Page ID 1477-80; Tr. 170-73; Exhs. 13, 14.) The notice to employees discussed "what happened in Memphis" and explained that "several partners are no longer with us." (Transcript, R. 73, PageID 1568, Tr. 261). Starbucks also hung that notice in stores beyond Memphis, and in at least one store in Jackson, Tennessee, it directly chilled employee Union activity. (Transcript, R. 73, Page ID

1600, Tr. 293.) Starbucks then disseminated news of the discharges of the Memphis Seven to employees nationwide by posting a note about them on its intranet hub. (Id.) The possibility that the Union's later protected discussions of the discharges may have contributed to far-flung employees' awareness of them is therefore irrelevant as to the injunction analysis at the Memphis store and falls far short of establishing that the court abused its discretion.

### 5. The injunction properly restores the lawful status quo.

Given the established erosion of Union support and the threat to the employees' ability to bargain effectively, there was a serious risk that, absent the court's injunction and with the passage of time, a final Board order would be rendered meaningless—unable to restore the lawful status quo. *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001) (the longer a union "is kept . . . from working on behalf of . . . employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining"). Further, without the injunction, the employees could take other jobs and become unavailable to return, which would, in effect result in Starbucks achieving its unlawful goal of permanently ridding its workforce of Union supporters, making a Board reinstatement order an empty formality. *Pye*, 238 F.3d at 74-75 ("improperly discharged employees are likely to accept other jobs and find it difficult, if not impossible, to accept reinstatement").

45

*See also Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 455 (1st Cir. 1990) (§10(j) relief appropriate whenever the circumstances create a reasonable apprehension that, absent an injunction, the efficacy of the Board's final order may be nullified during regular Board litigation).

Starbucks argues that the injunction is an abuse of discretion because returning to a pre-certification status quo is impossible since the Union has now won the election. (Starbucks' Brief, R. 50, PageID 38-42.) In arguing that the intervening election victory alters the propriety of the injunction, Starbucks misapprehends the meaning of the term "status quo." The status quo to be restored is the one in place prior to the onset of unfair labor practices, i.e., the legitimate and untainted level of employee support that would have existed at each stage of the organizing or collective-bargaining process absent the violations. *See Levine*, 610 F.2d at 437. Accordingly, the outcome of the election does not alter the court's consideration of the status quo to be restored. Contrary to Starbucks' contention, it is the impact of the violations on the panoply of employee § 7 rights—from organization to certification to bargaining a first contract and beyond—that informs the injunction analysis, and not the representational status of the employees at any one point in time. It is irrelevant whether the ameliorative effect of the injunction applies to the organizing stage or to a stage that has progressed to

union representation and bargaining, because each phase confers an equal statutory right.

Indeed, this Court has rejected narrow and erroneous interpretations of the status quo similar to that urged by Starbucks. In *Frye*, where the predecessor had closed operations and sent employees home before the violation, the Court concluded that "the state of affairs before the alleged unlawful conduct began was that of union representation." *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226 (6th Cir. 1993). This Court has also rejected analogous misinterpretations of the lawful status quo in cases involving other types of violations. In *Ahearn*, this Court rejected the argument that return to the status quo strictly meant a return to the employee's prior position. 351 F.3d at 240. In *Levine*, the Court granted an interim bargaining order to preserve the lawful status quo even though the union had not previously represented the employees. 610 F.2d at 437. Finally, in *Gottfried*, the Court found that to restore the status quo, it had to issue an interim order requiring a union to offer first-time admission to an employer it was unlawfully excluding from a national collective-bargaining agreement.

Accordingly, the district court's affirmation of the lawful status quo to be restored was correct and the injunction was just and proper. (District Court's Order Denying Stay, R. 96, PageID 1893-95).

**D. The District Court Applied the Correct § 10(j) Standard.**

Contrary to Starbucks' contention (Starbucks' Brief, R. 50, PageID 50-52), *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008), does not require abandonment of the Sixth Circuit's current two-part reasonable cause and just and proper test because *Winter* does not address statutory injunctions under § 10(j) and this Court's two-part test is, in any event, consistent with *Winter*.

*Winter* did not involve a § 10(j) injunction, but simply restated and clarified the traditional test for other types of preliminary injunctions, as set forth in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982). *See* 555 U.S. at 20. And this Court has already explicitly rejected the argument that its two-part § 10(j) standard must be abandoned in favor of the *Weinberger* four-part equitable test. *Ahearn*, 351 F.3d at 235 ("If the current 10(j) standard were in clear contravention of Supreme Court precedent, it seems unlikely that this or any other circuit would have continued to adhere to it for two decades without concern."). *Winter* does not require a different result and this Court has repeatedly rejected arguments that the four-part test is applicable, most recently in 2017, post-*Winter*. *See McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 343 (6th Cir. 2017), citing *Ahearn*, 351 F.3d at 234-35 (applying the "reasonable cause/just and proper" standard and declining to alter or replace it with traditional equitable criteria); *Muffley v. Voith*

*Indus. Services, Inc.*, 551 F. App'x 825, 827 & n. 1 (6th Cir. 2014) (reaffirming commitment to two-part standard despite split of authority).

 *Winter* involved the conventional use of preliminary injunctions in cases in which the district courts had subject-matter jurisdiction over, and were also deciding, the ultimate merits of the dispute. By contrast, only the Board has exclusive jurisdiction over unfair-labor-practice cases; the district court has no jurisdiction over the merits of the underlying violations and will not be adjudicating the ultimate merits of the case. *See Chester v. Grane Healthcare Co.*, 666 F.3d 87, 92 (3d Cir. 2011) ("Congress vested primary jurisdiction over the elaboration of labor policy and the adjudication of labor disputes in the NLRB"). For this reason, a district court is required to defer to Board adjudicatory procedures and "should be informed by the policies underlying § 10(j)" when using its equitable powers to assess the propriety of an injunction. *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 247 (3d Cir. 1998); *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 975-76 (6th Cir. 1982) (congressional intent underlying § 10(j) forms basis for district court's narrow scope of review). The deferential "reasonable cause" prong of this Court's two-part test, rather than the traditional "likelihood of success" prong of *Winter's* four-part test, better accommodates the limited role of the district court in reviewing unfair-labor-practices in a § 10(j) case, as other circuits have concluded. *See Chester*, 666 F.3d at 99-100; *Kreisberg*

*v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 141 (2d Cir. 2013) ("§ 10(j)…petitions come from a unique statutory scheme that requires [] deference to the National Labor Relations Board").

On these bases, other circuit courts have rejected the application of *Winter*'s four-part test to § 10(j) injunctions. *See McKinney v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 297 (5th Cir. 2015) (*Winter* dealt with a "significantly different context" and does not control § 10(j) injunctions; two-pronged test "is not inconsistent with Supreme Court precedent"); *Chester*, 666 F.3d at 92 (declining to apply *Winter's* standard, stating that *Winter* involved a "completely different context[] and…statutory schemes unrelated to the NLRA"); *Kreisberg*, 732 F.3d at 134 ("*Winter*…involved preliminary injunctions generally and not the specific right to injunctive relief created by the NLRA [and therefore] does not impact the standard for § 10(j) petitions").

Moreover, in reaffirming the four-part test for traditional injunctions, *Winter's* gloss on that test was that an injunction requires a likelihood of irreparable harm; courts cannot presume irreparable harm or grant injunctions on a mere possibility of harm. *Winter*, 555 U.S. at 22. Consistent with *Winter*, the Sixth Circuit's two-part test makes no such presumption. The "just and proper" prong of the Sixth Circuit's test requires a showing that there is "a reasonable apprehension that the efficacy of the Board's final order may be nullified or the administrative

procedures will be rendered meaningless." *Sheeran v. American Commercial Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (quoting *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967)) (internal quotations omitted). This threat of remedial failure is a type of irreparable harm that meets the *Winter* test. Indeed, it is precisely the irreparable harm that Congress intended to prevent via § 10(j). *See* S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted in I *Legislative History of the Labor Management Relations Act of 1947* 414, 433 (Government Printing Office 1985) (cited in *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1136 (10th Cir. 2000) and *Angle*, 382 F.2d at 659-660). And, in requiring a "reasonable apprehension" of remedial failure, i.e., at least some evidence in support, the Sixth Circuit requires more than mere possibility of harm. Thus, the Sixth Circuit's two-part test satisfies *Winter's* likelihood of harm requirement and its prohibition against presuming harm.

## VIII. CONCLUSION

Because the district court did not commit clear error or abuse its discretion in ordering interim relief, this Court should affirm the district court's August 18, 2022 order.

Respectfully submitted this 5th day of January, 2023,

/s/ Laurie Monahan Duggan

Richard J. Lussier
Assistant General Counsel
National Labor Relations Board
1015 Half Street Southeast
Washington, District of Columbia 20570
Telephone: 202-273-3826
E-mail: Richard.Lussier@nlrb.gov
Attorney for Petitioner-Appellee

Laura T. Vazquez
Deputy Assistant General Counsel
National Labor Relations Board
1015 Half Street Southeast
Washington, District of Columbia 20570
Telephone: 202-273-3832
E-mail: Laura.Vazquez@nlrb.gov
Attorney for Petitioner-Appellee

Laurie Monahan Duggan
National Labor Relations Board
1015 Half Street Southeast
Washington, District of Columbia 20570
Telephone: 202-273-9253
E-mail: Laurie.Duggan@nlrb.gov
Attorney for Petitioner-Appellee

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for the Petitioner-Appellee, furnishes the following in compliance with Fed. R. App. P. 32:

I hereby certify that this Brief for Petitioner-Appellee on Appeal from an Order of the United States District Court for the Western District of Tennessee conforms to the rules contained in Fed. R. App. P. 32(a)(4), (5), (6), and (7). The length of this Brief, exclusive of the items listed in Fed. R. App. P. 32(f), is 11,797 words.

## CERTIFICATE OF SERVICE

This certifies that, on January 5, 2023, the Brief for Petitioner-Appellee on Appeal from an Order of the United States District Court for the Western District of Tennessee was electronically served on all parties via the Court's ECF system.

/s/ Laurie Monahan Duggan